[No. A084730. First Dist., Div. Two. Sept. 27, 1999.]

JACK McLAUGHLIN et al., Plaintiffs and Respondents, v.
STATE BOARD OF EDUCATION et al., Defendants and Appellants.

200

**COUNSEL**

Daniel E. Lungren and Bill Lockyer, Attorneys General, Charlton G. Holland III, Chief Assistant Attorney General, Frank S. Furtek, Paul Reynaga and Angela M. Botelho, Deputy Attorneys General, for Defendants and Appellants.

Robert Pongetti, Peter Simshauser and Paul M. Eckles for One Nation/One California, Las Familias del Pueblo, Groria Matta Tuchman and Travell Louie as Amici Curiae on behalf of Defendants and Appellants.

Sharon L. Browne and Mark T, Gallagher for Pacific Research Institute for Public Policy and Center for Equal Opportunity as Amicus Curiae on behalf of Defendants and Appellants.

Ruiz & Sperow, Celia M. Ruiz, Laura Schulkind and Jennifer M. Joaquin for Plaintiffs and Respondents.

Joseph Jaramillo for Mexican American Legal Defense and Educational Fund as Amicus Curiae on behalf of Plaintiffs and Respondents.

Olson, Hegel, Leidigh, Waters & Fishburn, N. Eugene Hill, George Waters and Abhas Hajela for Education Legal Alliance of the California School Board Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

Barbosa Garcia, Jonathan B. Stone and Benjamin D. Nieberg for Sweetwater Union High School District as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

## RUVOLO, J.—

### I.

### INTRODUCTION

In the Primary Election held in June 1998, the voters of California passed Proposition 227, the "English Language in Public Schools" initiative statute, creating a new chapter in California's Education Code[1] (the Chapter). The enacted statutory scheme requires children in California's public schools who are of "Limited English Proficiency" (LEP) to be taught only in English, subject to the right of the parents of each affected child to seek a waiver from the requirement of English-only instruction. We are asked to decide solely[2] whether the Chapter is subject to the waiver provision of Education Code[3] section 33050, which generally allows local school districts to apply to the State Board of Education (State Board) for waivers from program requirements of the Education Code not enumerated in that section.[4] The parties and amici curiae[5] agree that Proposition 227 is silent as to section 33050.

We conclude that the plain meaning of Proposition 227 was to guarantee that LEP students would receive educational instruction in the English language, and that English immersion programs would be provided to facilitate their transition into English-only classes. Proposition 227 also vests parents of LEP students with the *sole* right to seek a waiver from the Chapter's provision requiring English-only instruction for their own children. The Chapter's language permits no other means by which the program

---

[1]Title 1, division 1, chapter 3, articles 1-9, codified at Education Code sections 300-340.

[2]We are neither asked nor required to pass on the constitutionality of Proposition 227. Facial constitutional challenges to Proposition 227 on the grounds that it violates the supremacy clause (art. VI, cl. 2) and the equal protection clause (14th Amend., § 1) of the United States Constitution, as well as the federal Equal Educational Opportunities Act (20 U.S.C. § 1701 et seq.), and title VI of the federal Civil Rights Act (42 U.S.C. § 2000d) have already been made and rejected in federal court. (*Valeria G.* v. *Wilson* (N.D.Cal. 1998) 12 F.Supp.2d 1007.)

[3]All further undesignated statutory references are to the Education Code.

[4]None of the statutory provisions comprising Proposition 227 are included within the list of exceptions to the general waiver in section 33050.

[5]Amicus curiae briefs have been filed by the Mexican American Legal Defense and Educational Fund (MALDEF); the Education Legal Alliance of the California School Boards Association (Education Legal Alliance); the Pacific Research Institute for Public Policy and Center for Equal Opportunity (PRI); One Nation/One California, Las Familias del Pueblo, Gloria Matta Tuchman, and Travell Louie; and the Sweetwater Union High School District (Sweetwater).

requirements may be waived, and in fact, allows for civil action against school districts, educators, and administrators who fail or refuse to provide English-only instruction (§ 320). To the extent there is any ambiguity as to the intent of Proposition 227, the legislative history clarifies that the Chapter was designed to wrest from school boards and administrators decisionmaking authority for selecting between LEP educational options, and repose this power exclusively in parents of LEP students. Thus, the Chapter is in direct and irreconcilable conflict with section 33050. In the face of such a " ' "positive repugnancy" ' " (*Regional Rail Reorganization Act Cases* (1974) 419 U.S. 102, 134 [95 S.Ct. 335, 354, 42 L.Ed.2d 320]), under well-recognized principles of statutory construction, the enactment of the Chapter amends by implication section 33050 to except these core provisions of the Chapter from the general waiver process.

Therefore, respondent school boards cannot apply for waivers from the requirements of the entire Chapter under the general waiver authority of section 33050, and the writ of mandamus granted by the trial court is hereby reversed.[6] The case is remanded to the trial court with directions to vacate its writ, and instead to issue an order denying the petition.

II.

FACTUAL HISTORY

A. *Pre-Proposition 227 History of LEP Education in California*

■ It has been repeated innumerable times that "the Legislature's power over the public school system [i]s 'exclusive, plenary, absolute, entire, and comprehensive, subject only to constitutional constraints.' [Citations.]" (*State Bd. of Education* v. *Honig* (1993) 13 Cal.App.4th 720, 754 [16 Cal.Rptr.2d 727].) Of course, the voters, acting through the initiative process in enacting statutory law, fulfill the same function and wield the same ultimate legal authority in matters of education, as does the Legislature. (Cal. Const., art. II, §§ 1 and 8; *Rossi* v. *Brown* (1995) 9 Cal.4th 688 [38 Cal.Rptr.2d 363, 889 P.2d 557].)

The administration of California's public school system by the executive branch has been, and is, vested in four primary public entities; three at the

---

[6]As we explain, because the waivers submitted by respondents apparently were general and sought exemption from *all* of the Chapter's sections, in reversing, we take no position as to whether there may be individual sections or subsections of the Chapter which may be waivable. For this reason, and because it is not before this court as a party, we need not decide the merits of amicus curiae Sweetwater's request for a partial waiver of the Chapter's requirements as discussed in its brief.

state level, and one at the local level. At the local level, the functioning of districtwide (unified school districts) or countywide schools is administered by school boards elected by their respective voter constituencies (school districts). (See generally, Cal. Const., art. IX, § 3.2; § 35100 et seq.; Elec. Code, § 1302.2.) At the state level, administrative authority is primarily vested in the State Board, which is comprised of 10 persons appointed by the Governor with the advice and consent of two-thirds of the California State Senate. (§§ 33000, 33030-33031.) The chief executive of the public school system is the elected state Superintendent of Public Instruction (Superintendent) (except where a vacancy exists allowing the Governor to make an interim appointment under (§ 33100). (Cal. Const., art. IX, § 2.) The executive branch of state government also includes within its departmental ranks the State Department of Education (Department) (§ 33300).

The State Board exercises direct administrative control over local school districts by adopting rules and regulations consistent with state law for the governance of local schools and school districts. (§ 33031.) How the state entities and offices are allocated or share responsibilities for public instruction in our state would entail a complex discourse that is mercifully unnecessary to our analysis. (But see generally, *State Bd. of Education* v. *Honig*, *supra*, 13 Cal.App.4th 720.) It is enough to quote the holding of the Third District in *State Bd. of Education* v. *Honig*, which summarized the hierarchical relationship of the three state entities as follows: "We conclude the Legislature intended the Board to establish goals affecting public education in California, principles to guide the operations of the Department, and approaches for achieving the stated goals. Its role as 'the governing . . . body of the department' (§ 33301, subd. (a)) refers to governance in the broad sense by virtue of its policymaking authority. The Legislature did not intend the Board to involve itself in 'micro-management.' Thus, its responsibility to 'direct and control' the Department (Black's Law Dict., [(5th ed. 1979)] p. 625[, col. 2]) necessarily involves general program and budget oversight as a means of monitoring the effectiveness of its policies. [¶] By contrast, the Legislature intended the Superintendent to be involved in 'the practical management and direction of the executive department.' (Black's Law Dict., *supra*, p. 41.) In this role, the Superintendent is responsible for day-to-day execution of Board policies, supervision of staff, and more detailed aspects of program and budget oversight." (*Id.* at p. 766, italics omitted.)

Relevant recent legal history of public instruction of LEP students in California begins with enactment of the Bilingual-Bicultural Education Act of 1976 (§ 52160 et seq.) (the Act). The Act set forth a comprehensive legislative structure designed to provide funding and to train bilingual

teachers sufficient to meet the growing student population of LEP students (§ 52165) through bilingual instruction in public schools (§ 52161). The avowed primary goal of the programs was to increase fluency in the English language for LEP students. Secondarily, the "programs shall also provide positive reinforcement of the self-image of participating students, promote crosscultural understanding, and provide equal opportunity for academic achievement, . . ." (§ 52161.)

The Act remained in effect until its sunset by subsequent law on June 30, 1987. (§ 62000.2, subd. (e).) While still in effect, certain central provisions of the Act were enumerated as exceptions to the waiver provision of section 33050. (§ 33050, subd. (a)(8).) Even after the Act's provisions became inoperative, bilingual education continued to be the norm in California public schools by virtue of the extension of funding for such programs provided in section 62002: "If the Legislature does not enact legislation to continue a program listed in Sections 62000.1 to 62000.5, inclusive, the funding of that program shall continue for the general purposes of that program as specified in the provisions relating to the establishment and operation of the program. . . . The funds shall be used for the intended purposes of the program, but all relevant statutes and regulations adopted thereto regarding the use of the funds shall not be operative, except as specified in Section 62002.5."

Bilingual education continued through extended funding under section 62002 until Proposition 227 was passed. Inexplicably, although the operative sections of the Act lapsed with the sunset of the law in 1987, school districts continued to request waivers from the State Board under section 33050 seeking to opt out of their bilingual programs. Equally inexplicably, the State Board continued to grant waivers from the defunct law until March 1998, when the State Board rescinded this practice.

B. *The Chapter's Salient Provisions*

Chief among those provisions of the Chapter important to our review is section 300, "Findings and declarations,"[7] which states: "The People of California find and declare as follows:

"(a) Whereas, The English language is the national public language of the United States of America and of the State of California, is spoken by the vast majority of California residents, and is also the leading world language for

---

[7]Section 340 states: "Under circumstances in which portions of this statute are subject to conflicting interpretations, Section 300 shall be assumed to contain the governing intent of the statute."

science, technology, and international business, thereby being the language of economic opportunity; and

"(b) Whereas, Immigrant parents are eager to have their children acquire a good knowledge of English, thereby allowing them to fully participate in the American Dream of economic and social advancement; and

"(c) Whereas, The government and the public schools of California have a moral obligation and a constitutional duty to provide all of California's children, regardless of their ethnicity or national origins, with the skills necessary to become productive members of our society, and of these skills, literacy in the English language is among the most important; and

"(d) Whereas, The public schools of California currently do a poor job of educating immigrant children, wasting financial resources on costly experimental language programs whose failure over the past two decades is demonstrated by the current high drop-out rates and low English literacy levels of many immigrant children; and

"(e) Whereas, Young immigrant children can easily acquire full fluency in a new language, such as English, if they are heavily exposed to that language in the classroom at an early age.

"(f) Therefore, It is resolved that: all children in California public schools shall be taught English as rapidly and effectively as possible."

Section 305 requires that "*all* children in California public schools *shall* be taught English by being taught in English. . . ." (Italics added.) This requirement is "[s]ubject to the exceptions provided in Article 3 [PARENTAL EXCEPTIONS]." The requirements for this parental waiver are spelled out in section 310,[8] and are themselves limited to the circumstances described in

---

[8]Section 310 states: "The requirements of Section 305 may be waived with the prior written informed consent, to be provided annually, of the child's parents or legal guardian under the circumstances specified below and in Section 311. Such informed consent shall require that said parents or legal guardian personally visit the school to apply for the waiver and that they there be provided a full description of the educational materials to be used in the different educational program choices and all the educational opportunities available to the child. Under such parental waiver conditions, children may be transferred to classes where they are taught English and other subjects through bilingual education techniques or other generally recognized educational methodologies permitted by law. Individual schools in which 20 pupils or more of a given grade level receive a waiver shall be required to offer such a class; otherwise, they must allow the pupils to transfer to a public school in which such a class is offered."

section 311.[9] No other mechanism for exception from the Chapter's requirements is specified.

Section 320 affords parents a right to sue if their child or children are not provided English-only instruction: "As detailed in Article 2 (commencing with Section 305) and Article 3 (commencing with Section 310), all California school children have the right to be provided with an English language public education. If a California school child has been denied the option of an English language instructional curriculum in public school, the child's parent or legal guardian shall have legal standing to sue for enforcement of the provisions of this statute, and if successful shall be awarded normal and customary attorney's fees and actual damages, but not punitive or consequential damages. Any school board member or other elected official or public school teacher or administrator who willfully and repeatedly refuses to implement the terms of this statute by providing such an English language educational option at an available public school to a California school child may be held personally liable for fees and actual damages by the child's parents or legal guardian."

Finally, amendment of the Chapter is limited to enactment of further voter initiative, or a bill passed by two-thirds of each house of the state Legislature and signed by the Governor. (§ 335.)

C. *History of Section 33050*

The current version of section 33050 contains the following waiver language: "(a) The governing board of a school district or a county board of

---

[9]Section 311 provides: "The circumstances in which a parental exception waiver may be granted under Section 310 are as follows: [¶] (a) Children who already know English: the child already possesses good English language skills, as measured by standardized tests of English vocabulary comprehension, reading, and writing, in which the child scores at or above the state average for his or her grade level or at or above the 5th grade average, whichever is lower; or

"(b) Older children: the child is age 10 years or older, and it is the informed belief of the school principal and educational staff that an alternate course of educational study would be better suited to the child's rapid acquisition of basic English language skills; or

"(c) Children with special needs: the child already has been placed for a period of not less than thirty days during that school year in an English language classroom and it is subsequently the informed belief of the school principal and educational staff that the child has such special physical, emotional, psychological, or educational needs that an alternate course of educational study would be better suited to the child's overall educational development. A written description of these special needs must be provided and any such decision is to be made subject to the examination and approval of the local school superintendent, under guidelines established by and subject to the review of the local Board of Education and ultimately the State Board of Education. The existence of such special needs shall not compel issuance of a waiver, and the parents shall be fully informed of their right to refuse to agree to a waiver."

education may, on a districtwide or countywide basis or on behalf of one or more of its schools or programs, after a public hearing on the matter, request the State Board of Education to waive all or part of any section of this code or any regulation adopted by the State Board of Education that implements a provision of this code that may be waived, except: . . ."[10]

Once a section 33050 waiver application is presented, the State Board is required to approve it unless the State Board specifically finds, among other things: "(1) The educational needs of the pupils are not adequately addressed. [¶] (2) The waiver affects a program that requires the existence of a schoolsite council and the schoolsite council did not approve the request. [¶] . . . [¶] (5) Guarantees of parental involvement are jeopardized. . . ." (§ 33051, subd. (a).) Failure by the State Board to take action within two regular meetings on a fully documented waiver request received by the Department shall be deemed to be approval of the waiver for a period of one year. (§ 33052, subd. (a).)

The progenitor of section 33050 is former section 52820, enacted in 1981 (Stats. 1981, ch. 100, § 25, p. 680). Like section 33050 today, this former statute provided that the "governing board may, on a districtwide basis or on behalf of one or more of its schools, request the State Board of Education to waive all or part of any section of this code, . . ." Despite its broad language, there is little doubt that the initial reach of this statute was intended to extend only to relieve local schools of the spending limitations imposed by categorical aid programs.

For example, the California State Assembly Education Committee reported that the intent behind section 52820 was to "provide districts with increased flexibility in *categorical aid programs* by . . . (c) empowering the Department of Education [*sic*] to waive virtually any Education Code requirements in order to improve the operation of a local program." (Former § 52820, subd. (a), italics added; see Assem. Ed. Com., Rep. on Assem. Bill No. 777 (1981-1982 Reg. Sess.) p. 2.) Indeed, once passed, the statute became part of chapter 12 of the Education Code, entitled the School-Based Program Coordination Act, which was enacted "to provide greater flexibility for schools and school districts to better coordinate the categorical funds they receive while ensuring that schools continue to receive categorical funds to meet their needs." (§ 52800.)

---

[10]While the language "that may be waived" appears by grammar and punctuation to modify both "all or part of any section of this code" as well as "any regulation . . . that implements a provision of this code," that language was added in 1988, when the waiver statute was expanded to include regulations. Therefore, it appears clear from the history of this change that the Legislature intended the phrase "that may be waived" to modify only regulations.

This ancestral version of the general waiver statute also limited, but did not eliminate, the ability of school districts to seek waivers of the requirements for bilingual education (former § 52820, subd. (a)(1)). A more limited waiver for bilingual education came the following year in 1982, when former section 52820 was replaced by section 33050 (Sen. Bill No. 968 (1981-1982 Reg. Sess.), enacted as Stats. 1982, ch. 1298, § 1, p. 4787).

Among the matters addressed in Senate Bill No. 968, which purported to be a "clean-up bill," to Assembly Bill No. 777 (former § 52820), was the inclusion of certain provisions of the Act as exceptions to the general waiver provision of the statute. (See Enrolled Bill Mem. to Governor, Sen. Bill No. 968 (1981-1982 Reg. Sess.) Sept. 9, 1982.) Additionally, the waiver statute was moved from chapter 12 of the Education Code (School-Based Program Coordination Act of 1976), and placed in that chapter which deals with the enumeration of powers of state educational agencies (tit. 2, div. 2, pt. 20, ch. 1, art. 3, codified at § 33050).

The significance of this transfer appears in section 17 of the new law: "The Legislature hereby finds and declares that the waiver authority granted to the State Board of Education pursuant to Chapter 100 of the Statutes of 1981 [Assembly Bill No. 777, enacted as former section 52820] is not limited to those programs specified in Chapter 12 (commencing with Section 52800) [School-Based Program Coordination Act] of Part 28 of the Education Code. [¶] Therefore, the changes made by Sections 1 and 2 of this act, which renumber the waiver provisions to clarify the authority of the State Board of Education, do not constitute a change in, but are declaratory of, existing law." (Stats. 1982, ch. 1298, § 17, p. 4794.)

Therefore, while originating as a means by which school districts could overcome restrictions placed on funds earmarked for categorical aid programs, the present version of the waiver statute is broader in scope. Moreover, the history makes clear that while extending application of section 33050 to programs beyond those forming part of the School-Based Program Coordination Act of 1976, the core elements of LEP education were specifically excepted from the waiver procedure, thereby alienating LEP educational choices from local control.

With this history, we turn to the present litigation and the issue it raises.

### III.

#### PROCEDURAL HISTORY

Anticipating the passage of Proposition 227, respondents Oakland, Berkeley, and Hayward school districts submitted the contested waiver requests

one week before the June 1998 Primary Election. However, after Proposition 227 passed, the State Board concluded that it did not have authority to grant waivers from the Chapter. Therefore, it refused to consider waiver requests from any school districts, and returned them to respondents.

On July 16, 1998, respondents filed a petition for writ of mandamus and complaint for declaratory and injunctive relief in the Alameda County Superior Court. Although not physically attached to the petition, respondents characterized their waiver requests as "requests for general waivers of California Education Code sections 300, *et seq.*" (Original italics.) Throughout the petition's allegations the requests were described as "general waiver request[s]." The cause of action for declaratory relief sought a determination that the State Board had a mandatory duty to "accept, consider and approve requests for general waivers of the newly adopted Education Code sections 300, *et seq.*," while the prayer for mandamus asked for a writ "commanding the State Board to accept, consider and approve requests for general waivers of Education Code sections 300, *et seq.*" (Original italics.)

At the hearing on the petition held on August 27, 1998, respondents suggested for the first time that their waiver requests did not seek to prevent parents from opting to have their LEP children educated in an English-only program, or from maintaining an action for damages for failing to provide such a program.[11] Appellants countered that the trial court should limit respondents to their pleadings because respondents had consistently characterized their waiver requests as "seeking to waive all of [sections] 300 *et seq.*, . . ." and failed to provide appellants with their actual waiver requests.[12]

The trial court apparently rejected these untimely, unsupported comments of counsel, and instead based its decision on the record, including respondents' pleadings. Because the petition unambiguously states that respondents were seeking general waivers from "sections 300, *et seq.*," and the actual waiver requests were never made part of the record, like the trial judge, we base our decision on the record evidence indicating that the waiver requests

[11]Counsel for respondents stated: "As to parents' options, parents have the option. There is a parental enforcement provision in 227. Any parent who wants a child in a[n] English program has a right that is enforceable by an action in damages. We don't seek to waiver that. [¶] If a parent doesn't want their child in a program, we're seeking to continue, and they have the right if we don't do what they want to sue us and sue us for an action of damages." Yet despite this remark, respondents did not seek leave to amend or to supplement their petition. Instead, they attempted to justify their failure to append the waiver requests to their petition by arguing: "[Appellants] had an opportunity to see them. If they don't know what's in them, it's because they chose to send them back to sender."

[12]The conclusion that the waiver requests at issue sought relief from the "entire scheme of Proposition 227" was shared by counsel for the Superintendent at the hearing.

submitted by respondents to the State Board sought refuge from all of the provisions of the Chapter, sections 300 through and including 340, for purposes of this appeal.

After oral argument, the trial court granted mandamus, ordering the State Board to consider the waivers previously submitted.[13] The court explained the basis for its grant of mandamus relief in an 11-page statement of decision. The trial court concluded there was nothing in the Chapter that addressed the general waiver provision, and that section 33050 authorized a waiver procedure as to "all or any part of any section" of the Education Code. The court noted case law requiring seemingly conflicting statutes to be read in a manner which harmonized them, giving each as much effect as permissible. By relying on this rule of statutory construction, as well as that which presumes the electorate was aware of the existence of the general waiver statute when the Chapter was enacted, the court determined that the parental waiver exception contained in the Chapter was co-existent with the waiver procedure outlined in section 33050; that is, the voters did not intend the Chapter to vitiate the ability of school districts as well as parents to obtain waivers.[14]

This timely appeal by the State Board followed.

IV.

DISCUSSION

A. *Standard of Review*

█ Issues of statutory construction are questions of law to which we accord a de novo standard of review. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].)

█ While it is not the prerogative of the judiciary to rewrite legislation to conform to a *presumed* intent (*California Teachers Assn.* v. *Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175]), the Supreme Court reminds us that the primary purpose of statutory construction is for the courts to determine and effectuate

---

[13]The court also refused petitioners' request for a ruling that the waiver requests were deemed denied by the State Board and for a preliminary injunction. However, we need not address these rulings because they were not challenged in this appeal.

[14]At the hearing, both the Superintendent and the Department confirmed that they were not opposed to the relief requested by petitioners. Thus, only the State Board and its amici curiae opposed the request for mandamus below and by way of this appeal.

the purpose of the law as enacted: "The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] But '[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' [Citations.] . . . Thus, '[t]he intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act.' [Citation.] Finally, we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" (*People* v. *Pieters* (1991) 52 Cal.3d 894, 898-899 [276 Cal.Rptr. 918, 802 P.2d 420].)

Moreover, in looking at the relationship between two statutes, "[l]iteral construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided. [Citation.] . . . [E]ach sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation]." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)

Therefore, in order to accomplish our task we must consider the following questions: What was the intent of each statute under consideration? Can the two be harmonized so that the legal effect intended by each can be carried out? If not, what is the legal significance of such a statutory conflict, and how should it be resolved?

B. *The Intent of the Chapter and Section 33050*

The Chapter's mandate that all public instruction in California be administered in the English language appears absolute, and with one exception, unconditional: ". . . all children in California public schools shall be taught English by being taught in English. In particular, this shall require that all children be placed in English language classrooms. . . ." (§ 305.) For those in need, "sheltered English immersion" programs normally of a year in length shall be provided to assist in their transition to English-only classrooms. (*Ibid.*) As noted, the only exception to this fiat is through the approval of a parental waiver request.

Should the school district fail or refuse to provide the option of English language instruction, the Chapter empowers the parents of any LEP student

to bring a civil suit to enforce the Chapter's provisions, and to seek actual damages and attorney fees. In instances where the failure or refusal is "willful[] and repeated[]," the action may proceed personally against elected officials, school board members, school administrators, and teachers responsible for noncompliance. (§ 320.) This right to sue is premised on the statutory finding that "all California school children have the right to be provided with an English language public education." (*Ibid.*) Amendment of the Chapter is limited to enactment of further voter initiative, or a bill passed by two-thirds vote of each house of the state Legislature and signed by the Governor. (§ 335.)

Thus, the Chapter on its face ensures in the strongest terms that English instruction of LEP students will be made available, even under pain of a potential lawsuit, except in those instances where the parents or guardian of the affected student request and qualify for a statutory waiver. No other form of waiver or exception from the dictates of the Chapter is available under this law.

Not dissimilarly, section 33050 appears unequivocal in the breadth of the right it extends to school districts to seek waivers from code requirements: "(a) The governing board of a school district . . . may . . . request the State Board of Education to waive all or part of any section of this code . . . ."

Despite the seemingly contradictory intentions implicit in the plain language of both the Chapter and section 33050, respondents and their amici curiae contend that because there is no *explicit* reference to section 33050 in the Chapter, the voters intended to allow for the continued use by school districts of the general waiver process because they were presumed to be aware of section 33050's existence when the Chapter was passed into law.

Respondents' contention relies on the general presumption in law that: "Both the Legislature and the electorate by the initiative process are deemed to be aware of laws in effect at the time they enact new laws and are conclusively presumed to have enacted the new laws in light of existing laws having direct bearing upon them. (*Viking Pools, Inc.* v. *Maloney* (1989) 48 Cal.3d 602, 609 . . . ; *People* v. *Weidert* (1985) 39 Cal.3d 836, 844 . . . ; *People* v. *Silverbrand* (1990) 220 Cal.App.3d 1621, 1628 . . . .)" (*Williams* v. *County of San Joaquin* (1990) 225 Cal.App.3d 1326, 1332 [275 Cal.Rptr. 302].)

But none of the cases they cite apply to instances where the courts have been faced with interpreting a new statute which patently conflicts with

existing law. For example, in *Williams* v. *County of San Joaquin*, *supra*, 225 Cal.App.3d 1326, the issue was whether criminal prosecutors were required to receive advance notice of a defendant's request for OR (own recognizance) release where the governing statute was silent on the point. An existing statute (Pen. Code, § 1274) required notice in cases where bail was sought. Noting the difference between a request for OR release and monetary bail, the Third District concluded that the Legislature's failure to incorporate the bail notice requirement into the OR release statute evidenced an intent not to do so, because the Legislature was presumed to know of the existence and content of the bail statute when the OR statute was passed. (225 Cal.App.3d at p. 1333.)

Other cited decisions relied on the presumption in similar contexts (*People* v. *Weidert* (1985) 39 Cal.3d 836 [218 Cal.Rptr. 57, 705 P.2d 380] [relying on existing law excepting juvenile proceedings from the definition of criminal proceedings to interpret new law that killing a witness to prevent testimony in a juvenile case was not the equivalent to a criminal proceeding that would subject defendant to death penalty]; *Viking Pools, Inc.* v. *Maloney* (1989) 48 Cal.3d 602 [257 Cal.Rptr. 320, 770 P.2d 732] [amendment to law extending statute of limitations for purposes of discipline under Contractors' State License Law for breach of warranty adopted in light of existing judicial decision defining "warranty"]).

Still other high court opinions question the conclusiveness of this presumption, particularly where legislative intent is presumed from inaction in the face of judicial decisions. (*People* v. *Morante* (1999) 20 Cal.4th 403, 429-430 [84 Cal.Rptr.2d 665, 975 P.2d 1071]; *Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1157 [278 Cal.Rptr. 614, 805 P.2d 873].) ■ Legislative silence after a court has construed a statute at most gives rise to "an arguable inference of acquiescence or passive approval [citations]." (*Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 563 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

Thus, unlike cases where lawmakers can be presumed to borrow from existing law to supply omitted meaning to later enactments, the presumption that one legislates with full knowledge of existing law is not conclusive, and not even helpful, in cases where a later enactment directly conflicts with an earlier law. No facile legal maxim exists to resolve such conflicts.

To the contrary, while exalted as being a core right of a democratic society (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 248 [149 Cal.Rptr. 239, 583 P.2d 1281]; *Hobbs* v. *Municipal Court* (1991) 233 Cal.App.3d 670, 683 [284 Cal.Rptr. 655]

disapproved on another point in *People* v. *Tillis* (1998) 18 Cal.4th 284, 295 [75 Cal.Rptr.2d ·447, 956 P.2d 409]), the voter initiative process is not without flaws. Although not deciding the validity of the legislative presumption as it applies to voter initiatives, the Supreme Court has acknowledged there exists qualitative and quantitative differences between the state of knowledge of informed voters and that of elected members of the Legislature. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 263, fn. 6 [221 Cal.Rptr. 794, 710 P.2d 861].)

More to the point is the frank comment in the concurring and dissenting opinion by Justice Broussard in *People* v. *Pieters*, *supra*, 52 Cal.3d 894, concerning the limitations on legislative review inherent in the initiative process: "We hold initiatives to a different standard than enactments by the Legislature because of the nature of the initiative process. Initiatives are the direct expression of the people, typically drafted without extended discussion or debate. Of Proposition 8, a far-reaching criminal initiative passed in 1982, we have recognized that 'it would have been wholly unrealistic to require the proponents of Proposition 8 to anticipate and specify in advance every change in existing statutory provisions which could be expected to result from the adoption of that measure.' (*Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 257 . . . .) In contrast to the proponents of initiatives, legislators and their staffs are entirely devoted to the analysis and evaluation of proposed laws. Indeed, we presume that the Legislature has knowledge of all prior laws and enacts and amends statutes in light of those laws. (See, e.g., *Estate of McDill* (1975) 14 Cal.3d 831, 839 . . . .)" (*People* v. *Pieters*, *supra*, 52 Cal.3d at p. 907 (conc. and dis. opn. of Broussard, J.).)[15]

Lawmakers themselves recognize the practical limits of legislating while avoiding the creation of conflicts in the law, whether by elected officials or the initiative process. For example, Assemblywoman Sheila James Kuehl, the current Chair of the Assembly Judiciary Committee, has written commentary recently, which emphasizes the need to recognize there are important limitations on the initiative process (Kuehl, *Either Way You Get Sausages: One Legislator's View of the Initiative Process* (1998) 31 Loyola L.A. L.Rev. 1327). One of these limitations is the absence of rigorous legislative review to ensure that the initiative's provisions are consistent with existing laws. Without such review, it is unlikely that other laws will be amended to avoid conflicts with the new rule of law announced in the initiative. Her hypothetical is prescient and apropos of the predicament created by Proposition 227: "For example, imagine an initiative that would require California to give full faith ·and credit to any domestic violence restraining order issued

---

[15]Interestingly, Justice Broussard made these observations while analyzing whether the drafters' oversight principle should be reserved for initiative-based lawmaking only.

by another state, territory, or tribal court. The proposed draft may be deficient in that there may be several sections of either the Family Code or the Code of Civil Procedure that would need to be amended while the draft addresses only two. Or, the proposed draft may require more deference to the other state than the Constitution allows or may fail to comport with a federal statute. A pre-initiative review by the Legislative Counsel's office would bring to light such deficiencies early in the process, give proponents the opportunity to correct such deficiencies early in the process, and give proponents the opportunity to structure the initiative's language to achieve their goals without violating the state or federal constitutions." (*Id.* at pp. 1331-1332.)

The point is, of course, that the initiative process itself, particularly when viewed in light of the number of existing laws that may be affected by any new law and that may require amendment or repeal to avoid creating conflicts, makes conflicts between the new law and existing laws virtually inevitable.[16] Therefore, we cannot simply rely on the legislative presumption of knowledge of existing law in deciding this case, for to do so here would exceed the tensility of this presumption, and ignore other principles of statutory construction developed in recognition of the fallibility of lawmaking.

## C. *Resort to the History of Proposition 227 Is Appropriate*

■ Where statutory language is clear and unambiguous, there is no need to construct the statute, and resort to legislative materials or other external sources is unnecessary. (*Quarterman* v. *Kefauver* (1997) 55 Cal.App.4th 1366, 1371 [64 Cal.Rptr.2d 741]). " 'Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language.' [Citations.] Of course, in construing the statute, '[t]he words . . . must be read in context, considering the nature and purpose of the statutory enactment.' [Citation.]" (*People* ex rel. *Lungren* v. *Superior Court* (1996) 14 Cal.4th 294, 301 [58 Cal.Rptr.2d 855, 926 P.2d 1042].)

But where the language may appear to be unambiguous yet a latent ambiguity exists, the courts must go behind the literal language and analyze the intent of the law utilizing "customary rules of statutory construction or legislative history for guidance. [Citation.]" (*Quarterman* v. *Kefauver, supra,* 55 Cal.App.4th at p. 1371.) This may include reference to ballot materials in

---

[16]While many sections have been repealed or reserved, it is noteworthy that the prodigious Education Code alone runs from section 1 to section 100560.

the case of initiatives in order to discern what the average voter would understand to be the intent of the law upon which he or she was voting. (*Legislature* v. *Eu* (1991) 54 Cal.3d 492, 505 [286 Cal.Rptr. 283, 816 P.2d 1309].)

One such case involving a latent ambiguity in statutory language created by the initiative process was *Legislature* v. *Eu, supra,* 54 Cal.3d 492, in which the Supreme Court was asked to determine the electorate's intent in passing the legislators' terms limits initiative ("The Political Reform Act of 1990," designated on the ballot as Proposition 140). An argument advanced by opponents of the initiative was that the term limits ban applied only to consecutive terms, and did not prevent a legislator from seeking elected office if that legislator was not holding office at the time of election. (*Id.* at p. 503.) In concluding the term "lifetime ban" was ambiguous in light of the issue raised, the court reviewed the ballot materials presented to the voters. After noting that such materials must be viewed with some degree of caution because the " 'fears and doubts' " expressed in ballot arguments may be "overstate[d]," the court was impressed by the "forceful[]" and "repeated[]" statement to the voters that the initiative would result in a "lifetime ban" on officeholders whose terms expired under the proposed law. (*Id.* at p. 505.) Therefore, the court concluded "[w]e think it likely the average voter, reading the proposed constitutional language as supplemented by the foregoing analysis and arguments, would conclude the measure contemplated a lifetime ban against candidacy for the office once the prescribed maximum number of terms had been served." (*Ibid.*; see also *White* v. *Davis* (1975) 13 Cal.3d 757, 775, fn. 11 [120 Cal.Rptr. 94, 533 P.2d 222]; *In re Quinn* (1973) 35 Cal.App.3d 473, 483 [110 Cal.Rptr. 881] disapproved on another point in *State* v. *San Luis Obispo Sportsman's Assn.* (1978) 22 Cal.3d 440, 447 [149 Cal.Rptr. 482, 584 P.2d 1088].)

Similarly, the seemingly absolute language of both the Chapter and section 33050 creates a latent ambiguity, certainly at least as to whether the Chapter's failure to refer specifically to section 33050 evinces an intent to have its mandate nevertheless subject to school district waivers. In light of this ambiguity, resort to the voter history of the Chapter is necessary and appropriate.

D. *The Campaign for Passage of Proposition 227*

Perhaps it rings of understatement to suggest that Proposition 227 was a controversial initiative. Advancing a debate that continues through today, and is reflected in the briefs of the parties and amici curiae, the campaigns

both supporting and opposing the proposition's passage disagreed vehemently as to the success or failure of bilingual education in California.[17] The ballot materials furnished all voters reflects a deep division of viewpoints as to whether LEP students should be predominantly taught in English, or in the students' native languages.

The proposition summary contained in the ballot pamphlet materials noted the proposed new law: "Requires all public school instruction be conducted in English. [¶] Requirement may be waived if parents or guardian show that child already knows English, or has special needs, or would learn English faster through alternate instructional technique." (Ballot Pamp., Prop. 227, Primary Elec. (June 2, 1998) p. 32.) The analysis by the Legislative Analyst included the note: "Schools must allow parents to choose whether or not their children are in bilingual programs." (Legis. Analyst, Analysis of Prop. 227, Ballot Pamp., Primary Elec., *supra*, at p. 32.)

The "Proposal" is described, in part, as "[r]equir[ing] California public schools to teach LEP students in special classes that are taught nearly all in English. This would eliminate 'bilingual' classes in most cases." Under *"Exceptions,"* the analyst notes "Schools would be permitted to provide classes in a language other than English if the child's parent or guardian asks the school to put him or her in such a class *and* one of the following happens: . . ." (Legis. Analyst, Analysis of Prop. 227, Ballot Pamp., Primary Elec., *supra*, at p. 33 , original italics.) The ballot argument in favor of Proposition 227 was signed by "Alice Callaghan, Director, Las Familias del Pueblo[,] Ron Unz, Chairman, English for the Children[, and] Fernando Vega, Past Redwood City School Board Member." The argument begins by arguing bilingual education has failed in California, "but the politicians and administrators have refused to admit this failure." Under "WHAT 'ENGLISH FOR THE CHILDREN' WILL DO," the argument states in part: "Allow parents to request a special waiver for children with individual educational needs who would benefit from another method." (Ballot Pamp., argument in favor of Prop. 227, Primary Elec., *supra*, at p. 34.)

The rebuttal argument was authored by John D'Amelio, president of the California School Boards Association, Mary Bergan, president of the California Federation of Teachers, AFL-CIO, and Jennifer J. Looney, president of the Association of California School Administrators. It begins by recounting the variety of programs used throughout California to teach LEP students. It then proclaims that "Proposition 227 outlaws all of these programs," and warns that if Proposition 227 passes, "[a]nd if it doesn't work,

---

[17]Directed primarily to the issue of irreparable harm as an element of petitioners' request for a preliminary injunction, the parties submitted learned treatises and declarations from social scientists and educators taking both sides of the issue. As explained, *post*, the prayer for a preliminary injunction is not before us today. Thus, amici curiae's reference to the merits of the underlying educational programs is neither appropriate nor useful in deciding the narrow question of statutory construction before this court.

we're stuck with it anyway." After describing funding sources for the campaign in favor of Proposition 227, the argument concludes: "These are not people who should dictate a single teaching method for California's schools. [¶] If the law allows different methods, we can use what works. Vote No on Proposition 227." (Ballot Pamp., rebuttal to argument in favor of Prop. 227 as presented to voters, Primary Elec., *supra*, at p. 34.)

Similarly, the ballot pamphlet's "Argument Against Proposition 227"[18] again cautioned that passage of the proposition would "*outlaw*[] *the best local programs* for teaching English." (Ballot Pamp., argument against Prop. 227 as presented to voters, Primary Elec., *supra*, at p. 35, original italics.) "A growing number of school districts are working with new English teaching methods. Proposition 227 stops them. [¶] . . . 'School districts should decide for themselves.' " (*Ibid.*)

Finally, Los Angeles teacher Jaime A. Escalante penned the proponents' "Rebuttal," which included the following: "Today, California schools are forced to use bilingual education despite parental opposition. We give choice to parents, not administrators." (Ballot Pamp., rebuttal to argument against Prop. 227 as presented to voters, Primary Elec., *supra*, at p. 35.)

Proposition 227 passed by a margin of 61 percent "yes" votes, to 31 percent "no" votes. (*Valeria G. v. Wilson*, *supra*, 12 F.Supp.2d 1007, 1012.)

If anything, this history only magnifies the conflict between the Chapter and section 33050. Among other things, the ballot materials reveal that voters were promised passage of Proposition 227 would establish an LEP method of instruction which would heavily favor use of English only, and would bestow the bilingual education "choice" to parents only. Even opponents of the initiative conceded that the proposed Chapter would "outlaw[]" decisionmaking by school districts to provide non-English instruction and, once passed, the electorate would be "stuck with it." They argued that passage of the proposition should be defeated so that "School districts [c]ould decide for themselves" what form of LEP instruction to provide. In a revealing rebuttal, the proponents concluded that the proposed new law "[would] give choice to parents, not administrators."

While undoubtedly florid in tone, the substance of the ballot arguments leads unwaveringly to the conclusion that voters believed Proposition 227 would ensure school districts could not escape the obligation to provide English language public education for LEP students in the absence of

---

[18]Its authors are the same as the rebuttal except Lois Tinson, president of the California Teachers Association, replaced Jennifer Looney.

parental waivers. Any other form of LEP education would be "outlaw[ed]." Voters would only be reinforced in this belief by reading the text of the proposition itself, which included such features as a right of action against school officials for failing or refusing to provide English instruction, and a requirement that amendment of the new law be limited to further voter initiative or a two-thirds vote of both state legislative houses.

In light of these facts and the unavoidable conclusions we must draw from them, there is simply no rational way to reconcile or harmonize the Chapter as an integrated whole with section 33050. One cannot uphold the clear and positive expression of intent in the Chapter, which mandates a strong English-based system of education subject *only* to parental waiver, while supporting the right of school districts to avoid the Chapter's decree through waivers. The statutes are in such irremediable conflict that to allow one would render the other "nugatory." (*Lungren* v. *Deukmejian*, *supra*, 45 Cal.3d at p. 735.)

How do courts respond to these conflicts? Are there rules of statutory interpretation that can be brought to bear to resolve the conflict? Since actual conflicts are inevitable given the breadth of California's extensive statutory law, courts have developed several applicable interpretative paradigms by which a later-enacted law in conflict with an existing statute may be given effect.

E. *The Chapter Amends Section 33050 by Implication*

California courts have long recognized that "an act adding new provisions to and affecting the application of an existing statute 'in a sense' amends that statute. . . ." (*Huening* v. *Eu* (1991) 231 Cal.App.3d 766, 773 [282 Cal.Rptr. 664] (*Huening*), quoting *Hellman* v. *Shoulters* (1896) 114 Cal. 136, 152 [45 P. 1057].) An implied amendment is an act that creates an addition, omission, modification or substitution and changes the scope or effect of an existing statute. (*Huening*, *supra*, at p. 774; *Franchise Tax Bd.* v. *Cory* (1978) 80 Cal.App.3d 772, 776 [145 Cal.Rptr. 819] [court found an implied amendment but invalidated it on constitutional grounds]; see generally, 1A Sutherland, Statutory Construction (5th ed. 1993) Amendatory Acts, § 22.13, p. 215.) Like the related principles of "[r]epeal[] by implication" (*Nickelsberg* v. *Workers' Comp. Appeals Bd.* (1991) 54 Cal.3d 288, 298 [285 Cal.Rptr. 86, 814 P.2d 1328]), and "draft[ers'] oversight" (*People* v. *Jackson* (1985) 37 Cal.3d 826, 838, fn. 15 [210 Cal.Rptr. 623, 694 P.2d 736], disapproved on another point in *People* v. *Guerrero* (1988) 44 Cal.3d 343, 348 [243 Cal.Rptr. 688, 748 P.2d 1150]), "amendments by implication" are disfavored but are allowed to preserve statutory harmony and effectuate the

intent of the Legislature (*Myers* v. *King* (1969) 272 Cal.App.2d 571, 579 [77 Cal.Rptr. 625]).

In *People* v. *Jackson, supra,* 37 Cal.3d at page 838, the Supreme Court concluded that the general sentencing limitation of double-the-base-term limit (Pen. Code, § 1170.1, subd. (g)) did not apply to restrict imposition of five-year enhancements for serious felonies (added as Pen. Code, § 667 under the voter initiative Proposition 8), and that the failure to specifically address Penal Code section 667 in Penal Code section 1170.1, subdivision (g) was the result of "draft[ers'] oversight."[19] (37 Cal.3d at p. 838, fn. 15.) Although the two statutes were not strictly in conflict, in order to give full effect to the apparent intention of the voters, the Supreme Court declared: "We conclude that enhancements for serious felonies under section 667 were not intended to be subject to the double base term limitation of [Penal Code] section 1170.1, subdivision (g). To carry out the intention of the enactment, we read section 1170.1, subdivision (g), as if it contained an exception for enhancements for serious felonies pursuant to section 667, comparable to the explicit exception for enhancements for violent felonies under section 667.5." (37 Cal.3d at p. 838.)

Similarly, in *People* v. *Pieters, supra,* 52 Cal.3d 894, the Supreme Court found a three-year enhancement for cocaine offenses involving more than 10 pounds of the drug was impliedly excepted from the same general double-the-base-term limit for sentencing (Pen. Code, § 1170.1, subd. (g)), thereby allowing a criminal defendant to be sentenced to a full three-year consecutive prison term enhancement under Health and Safety Code section 11370.4, subdivision (a)(2). In doing so, the high court explained that by determining section 11370.4 was limited by the general sentencing limit for subordinate terms, the "manifest intention" of the Legislature that dealers in large quantities of drugs would be more severely punished would be undermined. (52 Cal.3d at p. 901.) Therefore, it relied on the same "draft[ers'] oversight" it had articulated in *Jackson* in finding an implied exception to the general sentencing law for this new enhancement. (*Ibid.*)[20]

A somewhat different analysis had been employed by the Supreme Court a year earlier in *People* v. *Prather* (1990) 50 Cal.3d 428 [267 Cal.Rptr. 605,

---

[19]The phrases "drafter's oversight" and "drafters' oversight" are used in the cases analyzed and discussed herein. For purposes of uniformity in this opinion, we adopt usage of the plural form throughout our discussion *post.*

[20]In so concluding, the court distinguished *People* v. *Siko* (1988) 45 Cal.3d 820 [248 Cal.Rptr. 110, 755 P.2d 294], which is also relied on by respondents and their amici here. It noted, and we accept as equally applicable, that *Siko* did not involve the interpretation of a statute whose purpose would be "undermined" by the failure to find an implied exception. (*Id.* at p. 902.)

787 P.2d 1012]. In *Prather*, the Supreme Court was confronted with the question of whether one provision of then newly enacted Proposition 8 (Cal. Const., art. I, § 28, subd. (f)), which allowed prior felony convictions to be used for sentence enhancement purposes " 'without limitation' " was subject to the general sentencing limitation to double-the-base-term (Pen. Code, § 1170.1, subd. (g)). In that case, the enhancement under scrutiny was Penal Code section 667.5, subdivision (b), which allowed for a one-year enhancement to any felony sentence if the current offense occurred within five years from the defendant's prior confinement in state prison.

The Supreme Court determined that it could not rely on the "draft[ers'] oversight" rule set forth in *People* v. *Jackson, supra,* 37 Cal.3d 826, because there was insufficient evidence that the Legislature intended to except this enhancement from the general sentencing limitation, but failed to provide for it because of a "draft[ers'] oversight." Nevertheless, the court concluded that in order to effectuate the intent of the Legislature in enacting the enhancement, it was necessary to impliedly except section 667.5, subdivision (b) from the new limitation. (*People* v. *Prather, supra,* 50 Cal.3d at pp. 433-434, 439.)

Likewise, in *Huening, supra,* 231 Cal.App.3d 766, the court was faced with harmonizing the then newly enacted Elections Code former section 3564.1 with chapter 8 of the Political Reform Act of 1974, codified at Government Code section 81000 et seq., which generally regulates the content of ballot pamphlets. (231 Cal.App.3d at p. 778.) Elections Code former section 3564.1 prohibited the nonconsensual identification of a person in the ballot arguments as for or against the ballot measure. (231 Cal.App.3d at p. 769.) Chapter 8, in contrast, does not contain any limitation on the content of ballot arguments. (231 Cal.App.3d at p. 778.) To avoid the inherent conflict created when the two statutes were simultaneously applied, the court found that Elections Code former section 3564.1 impliedly amended chapter 8. (231 Cal.App.3d at p. 779.)[21]

Respondents urge us to avoid invoking the principle of "drafters' oversight" or amendment by implication because the two statutes at issue here can be harmonized. (*Nickelsberg* v. *Workers' Comp. Appeals Bd., supra,* 54 Cal.3d at p. 298.) In part, respondents contend that section 33050 is limited by section 33051, which places restrictions on the granting of waiver

---

[21]However, Elections Code former section 3564.1 was invalidated on other grounds. (*Huening, supra,* 231 Cal.App.3d at p. 779.)

requests.[22] Therefore, respondents and their amici curiae argue that appellants' concern that waivers will be granted without considering the views of LEP student parents are unfounded. Amicus curiae Education Legal Alliance of the California School Board Association similarly contends parental preferences will be considered as part of the public hearing requirement antecedent to any application for a general waiver (§ 33050, subds. (a) and (f)), while MALDEF asserts parental oversight is achieved through participation in schoolsite advisory boards or parent associations.

However, these observations miss the mark. The intent of the Chapter is not simply to ensure parental input into instructional decisions by local school boards. The Chapter's intent is that English instruction will be provided *in all cases* except those where parental waivers are made. Parents favoring English instruction for their children are assured by law that it will be provided *without the need to lobby school boards or form parent groups*. The Chapter inflexibly declares that, absent a parental waiver, the interests of LEP children are always best served by English-only instruction. It is only when a parent decides that English-only instruction is not appropriate for his or her child that an individual waiver need be sought. While public participation in local school affairs is to be encouraged and is arguably indispensable to achieving educational goals, it is not directly germane to the Chapter's legal operation. This new law vests decisionmaking over the method of LEP instruction exclusively with *individual* parents of LEP students—not committees, associations, parent groups, school board members, principals or teachers.

We are mindful that the principle of amendment or exception by implication is to be employed frugally, and only where the later-enacted statute creates such a conflict with existing law that there is no rational basis for harmonizing the two statutes, such as where they are " 'irreconcilable,

[22]In relevant part section 33051 states:

"(a) The State Board of Education shall approve any and all requests for waivers except in those cases where the board specifically finds any of the following:

"(1) The educational needs of the pupils are not adequately addressed.

"(2) The waiver affects a program that requires the existence of a schoolsite council and the schoolsite council did not approve the request.

"(3) The appropriate councils or advisory committees, including bilingual advisory committees, did not have an adequate opportunity to review the request and the request did not include a written summary of any objections to the request by the councils or advisory committees.

"(4) Pupil or school personnel protections are jeopardized.

"(5) Guarantees of parental involvement are jeopardized.

"(6) The request would substantially increase state costs.

"(7) The exclusive representative of employees, if any, as provided in Chapter 10.7 (commencing with Section 3540) of Division 4 of Title 1 of the Government Code, was not a participant in the development of the waiver. . . ."

clearly repugnant, and so inconsistent that the two cannot have concurrent operation. . . .' " (*In re White* (1969) 1 Cal.3d 207, 212 [81 Cal.Rptr. 780, 460 P.2d 980].)

 "One ferrets out the legislative purpose of a statute by considering its objective, the evils which it is designed to prevent, the character and context of the legislation in which the particular words appear, the public policy enunciated or vindicated, the social history which attends it, and the effect of the particular language on the entire statutory scheme. [Citations.]" (*Santa Barbara County Taxpayers Assn.* v. *County of Santa Barbara* (1987) 194 Cal.App.3d 674, 680 [239 Cal.Rptr. 769] (*Santa Barbara County Taxpayers Assn.*); *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 587 [128 Cal.Rptr. 427, 546 P.2d 1371].) "An interpretation which is repugnant to the purpose of the initiative would permit the very 'mischief' the initiative was designed to prevent. [Citation.] Such a view conflicts with the basic principle of statutory interpretation, *supra*, that provisions of statutes are to be interpreted to effectuate the purpose of the law." (*Santa Barbara County Taxpayers Assn.*, *supra*, 194 Cal.App.3d at p. 681.)

 In our view, the intention of the voters in passing Proposition 227 could hardly be clearer (except if they had directly addressed its relation to section 33050). We see no way that the guarantee of English-only instruction subject solely to parental waiver can be accomplished if school boards are allowed to avoid compliance with the entire Chapter by seeking waivers, no matter how well intentioned administrators may be in doing so. Under these circumstances, we conclude that the failure to specifically amend section 33050 to add the core provisions of the Chapter[23] was due to an oversight by the initiative's drafters.

Relevant to our invocation of "drafters' oversight" is the fact that the history of section 33050 and its precursor statute have historically protected LEP education from the waiver process. Respondents argue this history favors their position that, by enacting Proposition 227, the electorate intentionally chose to release English-only LEP education from waiver protection. But in light of the abolitionist tone of the proposition, including the ballot pamphlet materials, we believe the only reasonable conclusion is that the initiative's failure to conform section 33050 to the Chapter was simply the product of neglect.

We reach this same result by employing yet another, but related, rule of statutory construction. " 'It is the general rule that where the general

---

[23]We emphasize that our analysis accepts the premise that the waiver requests at issue went to *all* of the Chapter's sections. There may be waiver requests as to discrete sections or subsections of the Chapter that could be submitted without conflicting with the intent of the electorate, and indeed, may facilitate its implementation, which are not before us today.

statute standing alone would include the same matter as the special act, and thus conflict with it, the special act will be considered as an exception to the general statute whether it was passed before or after such general enactment. Where the special statute is later it will be regarded as an exception to or qualification of the prior general one; . . .' " (*In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593], quoting *People v. Breyer* (1934) 139 Cal.App. 547, 550 [34 P.2d 1065].) In *Williamson*, the court compared Business and Professions Code section 7030, which specifically punishes violations of the Business and Professions Code as misdemeanors, with Penal Code section 182, which punishes any conspiracy as a felony. There, the court found Business and Professions Code section 7030 to be the more specific and controlling statute. (*In re Williamson, supra*, 43 Cal.2d at p. 654.)

Also illustrative of this interpretative axiom is *Tapia v. Pohlmann* (1998) 68 Cal.App.4th 1126 [81 Cal.Rptr.2d 1] (*Tapia*). In *Tapia*, Division One of the Fourth District was faced with apparently conflicting statutes that appeared to relate to the satisfaction of California Children's Services Program medical treatment liens.[24] The public entity that held the lien relied on two statutes, which specifically provided for the payment of the lien amount out of any recovery by the minor patient from a third party source. (Gov. Code, § 23004.1; Health & Saf. Code, § 123982.) The minor contended that because the value of his claim had to be compromised due to inadequate insurance, the amount of the lien was subject to a reduction under the general statute applicable to minors' compromises. (Prob. Code, § 3601.)

In reversing the trial court's order reducing the lien, the court noted that to the extent the statutes were in conflict, the more specific statute applicable to the subject matter would control. "Where 'a general statute conflicts with a specific statute the specific statute controls the general one. [Citations.] The referent of 'general' and 'specific' is subject matter.' (*People v. Weatherill* (1989) 215 Cal.App.3d 1569, 1577-1578 . . . ; see also *Los Angeles Police Protective League v. City of Los Angeles* (1994) 27 Cal.App.4th 168, 178-179 . . . ; *Yoffie v. Marin Hospital Dist.* (1987) 193 Cal.App.3d 743, 748 . . . ; *Conservatorship of Ivey* (1986) 186 Cal.App.3d 1559, 1565 . . . ." (*Tapia, supra*, 68 Cal.App.4th at p. 1133, fn. omitted.) The court explained, " 'Unless repealed expressly or by necessary implication, a special statute dealing with a particular subject constitutes an exception so as to control and take precedence over a conflicting general statute on the same subject. [Citations.] This is the case regardless of whether the special provision is enacted before or after the general one [citation], and notwithstanding that the general provision, standing alone, would be broad enough to include the

---

[24]Health and Safety Code section 123872.

subject to which the more particular one relates.' ([*Conservatorship of Ivey*, *supra*, 186 Cal.App.3d] at p. 1565.)" (*Tapia, supra*, 68 Cal.App.4th at p. 1133, fn. 11.)

We find these decisions and their rationale equally compelling here. In the instant case, the subject of public school instruction of LEP students is directly and narrowly addressed by the Chapter. Combined with the waiver provisions enumerated in sections 310 and 311, the Chapter is immeasurably more specific than the broad, general references to "all or any part of" the Education Code contained in section 33050. As such, and given the clear conflict created by the two statutes, the language of the Chapter controls. For this additional reason, we conclude the general waiver embodied in section 33050 may not be used as a means to avoid the Chapter's mandate that, in the absence of parental waivers, LEP students "shall be taught English by being taught in English." (§ 305.)

V.

CONCLUSION

The writ of mandamus granted by the trial court is hereby reversed. The case is remanded to the trial court with directions to vacate its writ, and instead to issue an order denying the petition.

Kline, P. J., and Haerle, J., concurred.

Respondents' petition for review by the Supreme Court was denied December 21, 1999.