[No. A130721. First Dist., Div. Two. Jan. 9, 2013.]

LUIS ALEJO et al., Plaintiffs and Appellants, v.
TOM TORLAKSON, as Superintendent of Public Instruction, etc., et al.,
Defendants and Respondents.

## Counsel

California Rural Legal Assistance, Cynthia L. Rice; Youth Law Center, Deborah Escobedo and Damon A. King for Plaintiffs and Appellants.

David B. Sapp and Jessica Price for ACLU Foundation of Southern California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kyra Kazantzis and Asa Pittman for Law Foundation of Silicon Valley as Amicus Curiae on behalf of Plaintiffs and Appellants.

Yungsuhn Park and Nicole K. Ochi for Asian Pacific American Legal Center et al. as Amici Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Jennifer M. Kim, Acting Assistant Attorney General, Niromi W. Pfeiffer, Julie Weng-Guiterrez, Mateo Munoz and Christine Murphy, Deputy Attorneys General, for Defendants and Respondents.

## Opinion

**LAMBDEN, J.**—Luis Alejo, Maria Medina, Angelica Arechiga, Joel Avila, Frente Indígena Oaxaqueño Binacional, Comité Pro Educación, Parents for Unity, and Californians Together, plaintiffs below, sought in the trial court to compel defendants, Tom Torlakson, in his official capacity as the State Superintendent of Public Instruction (Superintendent); the State Board of Education (SBE); and California's State Department of Education (CDE), to rescind a suspension of onsite reviews of school district compliance with state and federal standards in programs benefitting educationally disadvantaged students. Plaintiffs also sought a court mandate that defendants develop an onsite monitoring schedule, develop a monitoring plan, and adopt regulations related to monitoring. In addition, plaintiffs sought a declaratory judgment that defendants' actions regarding onsite monitoring had violated various state and federal statutes and constituted an illegal expenditure of taxpayer funds.

Plaintiffs appeal from orders of the trial court denying their motion for peremptory writ of mandate and granting defendants' motion for summary judgment. We affirm the orders of the trial court.

## BACKGROUND

A number of educational programs benefit students belonging to groups identified as having special educational needs. Such programs include those targeted to students who have limited English proficiency (LEP), children of migratory workers, homeless or neglected children, and delinquent children. These "categorical programs" are funded by restricted state and federal allocations and program requirements are set by state and/or federal statutes and regulations.

The No Child Left Behind Act of 2001 (NCLB) (20 U.S.C. § 6301 et seq.) provides funding to states conditioned upon compliance with federal mandates regarding academic standards, assessment and accountability. (See 20 U.S.C. §§ 6302, 6304.) The NCLB seeks to advance its purposes by, inter alia, meeting "the educational needs of low-achieving children in our Nation's highest-poverty schools, limited English proficient children, migratory children, children with disabilities, Indian children, neglected or delinquent children, and young children in need of reading assistance." (20 U.S.C. § 6301(2).)

Pursuant to the NCLB, California receives funds specifically allocated for programs for LEP, migrant, homeless, and neglected or delinquent children. (20 U.S.C. §§ 6391–6399 [migrant], 6421–6472 [neglected or delinquent], 6801–7014 [LEP]; 42 U.S.C. §§ 11431–11435 [homeless].) In its application for funds under NCLB, California has described how it monitors school districts[1] to ensure compliance with federal requirements. Such monitoring is mandated by federal regulations. (34 C.F.R. § 80.40 (2012).)

### A. CDE Monitoring of Categorical Programs

California has mandated that the Superintendent, with the discretion to "establish the process and frequency for conducting reviews," conduct onsite monitoring of the categorical programs. (Ed. Code,[2] § 64001.) Section 52177, subdivision (d), mandates onsite monitoring of LEP programs once every three years, but whether this section is still operative is one of the legal issues in this case. The SBE is required to adopt regulations establishing the

---

[1] Many documents in the record use the term "local educational agency," or LEA, to denote the local level at which oversight is exercised. We use "school district" for this purpose, even if it is not, in all instances, technically correct. Some quoted passages below refer to LEA's.

[2] Unless otherwise indicated, all statutory references are to the Education Code.

standards and criteria to be used in the monitoring and evaluaicy officetion of categorical programs. (§ 54005.)

Categorical programs have been reviewed via a system called categorical program monitoring (CPM).[3] Under CPM, each school district was placed into one of four groups and a different group was scheduled for review each year. Districts were then selected for onsite review based on criteria that conformed with section 64001. Between 100 and 250 districts received onsite reviews annually during each school year.

In addition to onsite monitoring, CDE categorical program staff engage in a variety of other monitoring and oversight activities. The staff holds meetings and engages in other interactions with school districts, teachers, parents and students. They confer with, and respond to questions from, school district officials and teachers regarding educational programs, including the correction of deficiencies that have been identified. Through these interactions, staff can monitor and assess program compliance. When necessary, staff can recommend a course of action so that the district achieves or maintains compliance with state and federal program requirements.

CDE also maintains the unified complaint process, which is used, in part, to monitor and assess compliance with categorical program requirements. (See Cal. Code Regs., tit. 5, §§ 4600–4687.) The complaint process provides that any interested person may file a complaint alleging a violation of federal or state law concerning the provision of educational services, including NCLB programs. (Cal. Code Regs., tit. 5, §§ 4610, 4630.) CDE investigates complaints made vià the complaint process and can issue a corrective action to remedy a specific grievance or to address a systemic problem.

The CDE Language Policy and Leadership Office is responsible for the monitoring and oversight of districts that have been awarded NCLB funds for LEP and migrant students. The CDE has established English proficiency standards, conducts an annual student assessment of English proficiency, and has defined annual measurable achievement objectives (AMAO) for increasing the percentage of LEP students making progress in learning English and in attaining English proficiency. The language policy office annually monitors student academic performance data from each district in order to determine whether the district has met its AMAO's for the year.

If a district does not meet the AMAO's for two consecutive years, it must develop an improvement plan. If a district does not meet the AMAO's for four consecutive years, CDE imposes additional sanctions, such as requiring

---

[3] The monitoring system had previously been called coordinated compliance review (CCR).

modification of curriculum, program, and method of instruction of LEP students. In addition, by agreements with selected county offices of education, the CDE will assist the district in the development and implementation of an action plan to ensure that AMAO's will be met in the future.

The language policy office also monitors districts' fiscal operations in order to determine whether the policies and expenditure of funds are in alignment with student achievement outcomes and instructional goals to develop English language proficiency and improve reading, language arts and mathematical skills, based on the assessed needs of LEP students. During the 2008–2009 school year, there were 135 districts that failed to meet their AMAO's for two consecutive years and 58 districts that failed to meet their AMAO's for four consecutive years.

Districts whose students fail to make academic progress, and which are in danger of being assigned "program improvement" status, are subject to corrective action and sanctions. Such districts may be required to work with a district assistance and intervention team, which provides technical assistance to help the district comply with federal requirements under the NCLB. Through the assistance teams, the CDE monitors and provides technical assistance to districts to correct the educational program activities giving rise to low student academic achievement. The assistance teams review all facets of school operations, including the design and operation of instructional programs, deployment of staff, fiscal operations, professional development, use of data, work with parents and the community, and governance.

CDE's School Fiscal Services and Audits and Investigations Divisions conduct on- and offsite monitoring of school district programs and operations and the corresponding financial expenditures in order to determine if districts are in compliance with state and federal requirements.

B. *The Suspension of Nonmandatory Onsite Monitoring*

On December 19, 2008, the Governor issued Governor's Executive Order No. S-16-08, requesting that state government entities achieve budget savings for the fiscal years 2008–2009 and 2009–2010. The Superintendent issued his state of education address on February 3, 2009, and discussed the impact of the fiscal crisis on public education. The Superintendent explained that schools faced "staggering" midyear reductions in state financing for the 2008–2009 school year—reductions that might amount to $10 billion—and that further reductions were predicted for 2009–2010 and 2010–2011. The Superintendent announced that nonmandated onsite monitoring would be suspended for at least one year so that school districts could focus on improving student achievement rather than preparing for program audits. The

Superintendent also directed his staff to use the time and resources they saved from temporarily suspending onsite CPM reviews to conduct a review and redesign of CDE's compliance monitoring system.

On March 23, 2009, the Superintendent issued a formal notice implementing the suspension of all nonmandated, onsite CPM reviews for at least one year. The notice expressly provided that CDE's other monitoring activities would continue. Onsite reviews of 105 districts that had met the selection criteria were cancelled. Of these, only 11 were rescheduled, a year later, and the other 94 were eliminated based on new selection criteria. Prior to the suspension, 45 onsite reviews were held out of those originally scheduled for the 2008–2009 school year.

In 2010 a modified CPM system was implemented, which included piloted components of a potential CPM redesign. During the 2009–2010 review cycle, 30 onsite reviews were conducted and 11 of these were makeup reviews of districts whose reviews had been cancelled in 2008–2009. In addition, two onsite reviews of programs operated by the Division of Juvenile Justice were conducted.

C. *Procedural History*

In June 2009, plaintiffs filed a petition for writ of mandate, including separate causes of action for declaratory relief and taxpayer relief. The petition sought an order that defendants reinstate onsite monitoring, develop an onsite monitoring schedule, develop a monitoring plan, and adopt regulations. It also sought relief in the form of preliminary and permanent injunctions, and a declaratory judgment that defendants' actions had violated various state and federal statutes and constituted an illegal expenditure of taxpayer funds.

Plaintiffs filed a motion for preliminary injunction solely on the question of whether defendants had failed to meet the specific requirement of section 52177 to conduct reviews of LEP programs every three years. On December 3, 2009, the court entered an order denying that motion.

Defendants filed a motion for summary judgment as to all causes. Plaintiffs filed a motion for peremptory writ of mandate addressing only the writ of mandate cause of action. A hearing on both motions was held on August 12, 2010.

In moving for the issuance of a peremptory writ of mandate, plaintiffs alleged that (1) CDE failed to comply with its ministerial duty to conduct onsite reviews of LEP programs every three years as required by section

52177, subdivision (d); (2) the Superintendent and CDE violated their mandatory duties under section 64001 and the Equal Educational Opportunities Act of 1974 (EEOA) (20 U.S.C. § 1703(f)); (3) the Superintendent and CDE abused their discretion by failing to implement an onsite monitoring program that fulfills the purposes of section 64001, the EEOA, the NCLB, and the McKinney-Vento Homeless Education Assistance Improvements Act of 2001 (42 U.S.C. § 11431 et seq.); and (4) the SBE failed, as required by section 54005, to promulgate regulations governing educationally disadvantaged youth programs. Defendants asserted that (1) they had no ministerial duty under section 52177, subdivision (d); (2) they did not violate any mandatory duty imposed by section 64001 or federal law; (3) they did not abuse their discretion by the temporary suspension or in implementing revisions to the CPM onsite monitoring system; and (4) SBE did promulgate regulations governing educationally disadvantaged youth programs.

Defendants moved for summary judgment on the following grounds: (1) the temporary suspension of CPM reviews did not constitute a breach of a ministerial duty; (2) no present legal duty exists under section 52177, subdivision (d), as the law has sunset and is inoperative; (3) SBE adopted regulations governing the Educationally Disadvantaged Youth Programs; (4) plaintiffs have no claim or cause of action arising from the temporary suspension of CPM reviews under federal law, including the NCLB, EEOA, and title VI of the Civil Rights Act of 1964 (Pub.L. No. 88-352 (July 2, 1964) 78 Stat. 241); (5) plaintiffs' taxpayer cause of action lacked merit as the temporary suspension of nonmandatory onsite CPM reviews was discretionary in nature and was not an illegal expenditure or waste of public funds; and (6) the monitoring of compliance with state and federal educational requirements did not cease during the period when CPM onsite reviews were temporarily suspended.

The trial court issued a statement of decision denying plaintiffs' motion for a peremptory writ of mandate. The court then granted defendants' motion for summary judgment, adopting and incorporating by reference the statement of decision denying plaintiffs' motion. The trial court made specific legal and factual findings, including (1) the temporary suspension of nonmandatory onsite CPM reviews did not constitute a breach of a ministerial duty; (2) section 52177 had not sunset and was operative; (3) section 64001 is a more specific statute and takes precedence over section 52177 in defining and providing for the monitoring authority; (4) SBE had properly adopted regulations; (5) plaintiffs did not have a claim or cause of action arising from the temporary suspension of CPM reviews under federal law, including the provisions of the NCLB, the EEOA, or title VI of the Civil Rights Act of 1964; (6) plaintiffs' taxpayer cause of action was denied because the temporary suspension was discretionary in nature, the Superintendent did not abuse his discretion when temporarily suspending the CPM reviews, and, thus, there

was no illegal expenditure or waste of public funds caused by the temporary suspension; and (7) defendants' other monitoring of categorical program compliance with state and federal requirements was not suspended and did not cease during the suspension of CPM onsite reviews.

Defendants filed notices of entry with respect to the orders of the trial court on October 19, 2010. Plaintiffs filed their notice of appeal on November 24, 2010, with respect to both orders. The court entered judgment on December 21, 2010. On February 15, 2011, this court granted a joint motion to consider this appeal timely as to the judgment entered on December 21, 2010, pursuant to California Rules of Court, rule 8.104(d)(2).[4]

## DISCUSSION

### I. *The Denial of the Motion for Writ of Mandate*

Plaintiffs allege various ministerial duties that defendants have violated, as well as alleging that defendants have abused their discretion in the performance of duties. We examine each of plaintiffs' allegations below, but conclude that defendants have neither violated ministerial duties nor abused their discretion. Because we so conclude, we affirm the trial court's denial of plaintiffs' motion for writ of mandate.

### A. *Standard of Review*

Code of Civil Procedure section 1085, subdivision (a) provides: "A writ of mandate may be issued by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station . . . ." "[M]anda-mus will not lie to control an exercise of discretion, i.e., to compel an official to exercise discretion in a particular manner. [Citation.] Generally, mandamus may only be employed to compel the performance of a duty that is purely ministerial in character." (*Morris v. Harper* (2001) 94 Cal.App.4th 52, 62 [114 Cal.Rptr.2d 62].)

"In most cases, the appellate court must determine whether the agency had a ministerial duty capable of direct enforcement or a quasi-legislative duty

---

[4] We have received three amicus curiae briefs to assist this court in deciding the issues presented by this appeal. Specifically, we have granted permission to file amicus curiae briefs in support of plaintiffs to the ACLU Foundation of Southern California; to the Law Foundation of Silicon Valley; and to the Asian Pacific American Legal Center, African American Parent/Community Coalition for Educational Equity, Center for Human Rights and Constitutional Law, Central American Resource Center, Central California Legal Services, Chinese for Affirmative Action, Community Asset Development Re-defining Education, Legal Services of Northern California, Public Counsel, and Watts/Century Latino Organization (filing jointly).

entitled to a considerable degree of deference. This question is generally subject to de novo review on appeal because it is one of statutory interpretation, a question of law for the court." (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1266 [4 Cal.Rptr.3d 536].) "Even if mandatory language appears in the statute creating a duty, the duty is discretionary if the [entity] must exercise significant discretion to perform the duty." (*Sonoma AG Art v. Department of Food & Agriculture* (2004) 125 Cal.App.4th 122, 127 [22 Cal.Rptr.3d 468].)

"Where the duty in question is not ministerial, mandate relief is unavailable unless the petitioner can demonstrate an abuse of discretion. ' "[W]hile, of course, it is the general rule that mandamus will not lie to control the discretion of a court or officer, meaning by that that it will not lie to force the exercise of discretion in a particular manner . . . [it] will lie to correct abuses of discretion . . . ." [Citation.] In determining whether an abuse of discretion has occurred, a court may not substitute its judgment for that of the administrative board [citation], and if reasonable minds may disagree as to the wisdom of the board's action, its determination must be upheld [citation].' [Citation.] A decision is an abuse of discretion only if it is 'arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair.' [Citation.]" (*Mooney v. Garcia* (2012) 207 Cal.App.4th 229, 235 [143 Cal.Rptr.3d 195].)

When there is no ministerial duty and review is for abuse of discretion, such limited review is grounded in the doctrine of separation of powers, acknowledges the expertise of the agency, and derives from the view that " '[c]ourts should let administrative boards and officers work out their problems with as little judicial interference as possible. . . .' " (*Lindeil Co. v. Board of Permit Appeals* (1943) 23 Cal.2d 303, 315 [144 P.2d 4]; see *Western/California, LTD v. Dry Creek Joint Elementary School Dist.* (1996) 50 Cal.App.4th 1461, 1492 [58 Cal.Rptr.2d 220].) It also recognizes that a challenged administrative agency action comes before the court with a strong presumption that the agency's official duty has been regularly performed and the burden is on appellants to show the agency's action is invalid. (*Luxor Cab Co. v. Cahill* (1971) 21 Cal.App.3d 551, 557 [98 Cal.Rptr. 576].)

## B. *Obligations Under Federal Law*

Plaintiffs contend that the temporary suspension of onsite monitoring and "failure to implement a meaningful alternative" violated defendants' mandatory duties under federal law. They argue that "[t]he discretion granted under section 64001 must be construed in light of the other mandatory duties imposed upon the State of California by federal law."

### 1. *Obligations Under the EEOA*

 The EEOA requires each state "to take appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." (20 U.S.C. § 1703(f).) Plaintiffs propose that defendants "do not have unfettered discretion under the EEOA to construe 'appropriate action' any way they choose. Onsite reviews are the manner by which the Legislature has determined that LEP programs are to be monitored. The EEOA does not allow them to cease all such monitoring while they 'revise' or 'pilot' a new system, especially where there is no evidence that the existing monitoring process needs any tampering or has any identified flaws."

". . . Congress' use of the less specific term, 'appropriate action,' . . . indicates that Congress intended to leave state and local educational authorities a substantial amount of latitude in choosing the programs and techniques they would use to meet their obligations under the EEOA. However, by including an obligation to address the problem of language barriers in the EEOA and granting limited English speaking students a private right of action to enforce that obligation in [title 20 United States Code section 1706], Congress also must have intended to insure that schools made a genuine and good faith effort, consistent with local circumstances and resources, to remedy the language deficiencies of their students . . . ." (*Castaneda v. Pickard* (5th Cir. 1981) 648 F.2d 989, 1009.) Because defendants must exercise significant discretion to perform their duty of taking "appropriate action," the duty is not ministerial and our review is limited to abuse of discretion.

The EEOA nowhere requires that states maintain an onsite monitoring program. Whether defendants are fulfilling their "appropriate action" obligation under the EEOA by performing adequate monitoring of districts would require a thorough examination of all of defendants' monitoring activities in order to determine whether they have abused their discretion. Unfortunately, plaintiffs have focused solely on onsite monitoring, its suspension, and the change in criteria for selection for onsite review. Plaintiffs' myopic view of defendants' monitoring activities is demonstrated in their briefs by statements such as: "Respondents repeatedly confirmed that their ad hoc criteria and monitoring schedule were not in final form, and would not be for at least another year and they certainly were not tested. In effect, California had no monitoring system currently in effect that fulfilled its EEOA obligation." By failing to make allegations in their complaint about defendants' other monitoring activities, and by failing to create a full evidentiary record concerning them, plaintiffs make it impossible for any court to determine whether defendants' monitoring activities violate federal law because they do not constitute "appropriate action." Accordingly, we agree with the trial court that "plaintiffs did not have a claim or cause of action arising from the temporary

suspension of CPM reviews under federal law"—at least with regard to plaintiffs' arguments based on the EEOA's requirement of appropriate action.

### 2. *Obligations Under the NCLB*

■ The NCLB requires each participating state to provide assurances that, among other requirements, it "will adopt and use proper methods of administering each such program," including assurances that it will correct "deficiencies in program operations that are identified through audits, monitoring, or evaluation." (20 U.S.C. § 7844(a)(3).)

In 2002, the SBE filed its consolidated state application for NCLB with the United States Department of Education (USDE). In this application, the state made the general assurances required by title 20 United States Code section 7844, as well as various program specific assurances. The assurances were preceded by descriptions of California educational activities, including the former CCR onsite monitoring process. Onsite monitoring is not mentioned in the formal assurances provided pursuant to title 20 United States Code section 7844 and other statutes.

Plaintiffs contend that defendants "specifically assured the USDE that it would monitor districts through the onsite CPM (or CCR) process" and that the trial court "erred by failing to enforce the express assurances made by respondents to their federal funding agency. These are ministerial in nature and may be enforced through writ of mandate."

Plaintiffs are simply wrong in reading into the consolidated state application a specific assurance that districts would be monitored through the CPM or CCR process. The assurances contained in the application, required by federal law, may well establish certain ministerial duties on defendants' part. However, the description of onsite monitoring was not included in the assurances section of the application and plaintiffs point to no authority that would lead us to believe that by simply describing the current State of California educational activities to the USDE, defendants thereby relinquished their discretion to change those activities, so long as, in doing so, the requirements of state and federal law were satisfied.

The one case that plaintiffs do cite involved the state plan, required under federal law, for the policy and method of setting Medicaid reimbursement rates. (*California Assn. for Health Services at Home v. State Dept. of Health Services* (2007) 148 Cal.App.4th 696, 701 [56 Cal.Rptr.3d 102].) State regulations required the State Department of Health Services to administer the Medi-Cal program according to the state plan, but the department failed to conduct an annual review of Medi-Cal reimbursement rates as the plan

required. (*Id.* at pp. 701–702.) The court held that the plaintiffs could compel the state to perform its duty to conduct an annual review. (*Id.* at p. 708.)

Here, in contrast, plaintiffs point to no state or federal law or regulation that creates a ministerial duty compelling defendants to continue the educational activities described in the consolidated state application without change. As for whether defendants abused their discretion in meeting the actual assurances contained in the application, then, as with defendants' obligations under the EEOA, we cannot make that determination because plaintiffs have failed to make allegations and build a record that takes into account the entire scope of defendants' monitoring activities.

C. *The Relevant California Statutory Framework*

In 1976, the Legislature passed the Chacon-Moscone Bilingual-Bicultural Education Act (BBEA), which became effective in 1977 as section 52160 et seq. (Stats. 1977, ch. 36, § 484, pp. 326–337.) "The [BBEA] set forth a comprehensive legislative structure designed to provide funding and to train bilingual teachers sufficient to meet the growing student population of LEP students [citation] through bilingual instruction in public schools [citation]." (*McLaughlin v. State Bd. of Education* (1999) 75 Cal.App.4th 196, 203–204 [89 Cal.Rptr.2d 295] (*McLaughlin*).) The stated purpose of the BBEA, from section 52161, was "to require California school districts to offer bilingual learning opportunities to each limited-English-speaking pupil enrolled in the public schools, and to provide adequate supplemental financial support to achieve such purpose." (Stats. 1977, ch. 36, § 484, pp. 326–327.)

Former section 52177 assigned to the Superintendent "the duty to administer the provisions" of the BBEA "[o]ut of funds appropriated for such purposes." (Stats. 1977, ch. 36, § 484, pp. 334–335.) That section enumerated some of the administrative duties of the Superintendent, but onsite monitoring was not specified. (*Ibid.*)

The BBEA was amended in 1980 by the Bilingual Education Improvement and Reform Act of 1980 (BEIRA). (Stats. 1980, ch. 1339, pp. 4692–4716.) The BEIRA made only minor changes in wording to the purpose of the BBEA. (Stats. 1980, ch. 1339, § 5, pp. 4694–4695.) The BEIRA also amended former section 52177 to specify that among the administrative responsibilities of the Superintendent was to ensure that "Districts are providing each pupil of limited English proficiency with an educational opportunity equal to that available to English-speaking pupils; that they are making appropriate use of local and state general funds to provide bilingual-crosscultural teachers and other required services; and that an annual report is made to the Legislature regarding the extent to which this article has been

implemented by school districts throughout the state. All districts in which pupils of limited English proficiency are enrolled shall be reviewed through an onsite technical assistance, monitoring, and enforcement process at least once every three years." (Stats. 1980, ch. 1339, § 33, pp. 4711–4712.) This provision, with nonsubstantive changes in punctuation and wording,[5] is currently in the code as section 52177, subdivision (d).

In 1983, the Legislature passed a bill (hereafter, 1983 Act) that made significant changes to the governance of categorical programs in the Education Code, stating: "It is the intent of the Legislature, in enacting this act, to maintain and improve educational program quality while providing greater flexibility at the state and local levels, and to reduce paperwork which does not have direct educational benefit." (Stats. 1983, ch. 1270, § 1, p. 5037.)

One of the provisions of the 1983 Act was to "sunset" a number of educational programs, including "Bilingual Education." (Stats. 1983, ch. 1270, § 10, pp. 5041–5042.) The sunset date was originally set at June 30, 1986, but that date was changed to June 30, 1987, by a 1984 amendment. (*Ibid.*; Stats. 1984, ch. 1318, § 1, p. 4525.) The sunset of the bilingual education program as of June 30, 1987, is currently codified as section 62000.2. The sunset date is the date on which the specified program "cease[s] to be operative." (§ 62000.)

The effect of the sunset, and its impact on funding, is further specified in section 62002: "If the Legislature does not enact legislation to continue a program listed in this part, the funding of that program shall continue for the general purposes of that program as specified in the provisions relating to the establishment and operation of the program. The funds shall be disbursed according to the identification criteria and allocation formulas for the program in effect on the date the program shall cease to be operative pursuant to this part both with regard to state-to-district and district-to-school disbursements. The funds shall be used for the intended purposes of the program, but all relevant statutes and regulations adopted thereto regarding the use of the funds shall not be operative, except as specified in Section 62002.5."

Section 62002.5 specifies the exceptions to the sunset provision: "Parent advisory committees and school site councils which are in existence pursuant

---

[5] Section 52177, subdivision (d), currently reads: "Districts are providing each pupil of limited-English proficiency with an educational opportunity equal to that available to English-speaking pupils; they are making appropriate use of local and state general funds to provide bilingual-crosscultural teachers and other required services; and an annual report is made to the Legislature regarding the extent to which this article has been implemented by school districts throughout the state. All districts in which pupils of limited-English proficiency are enrolled shall be reviewed through an onsite technical assistance, monitoring, and enforcement process at least once every three years."

to statutes or regulations as of January 1, 1979, shall continue subsequent to the termination of funding for the programs sunsetted by this chapter. Any school receiving funds from Economic Impact Aid or Bilingual Education Aid subsequent to the sunsetting of these programs as provided in this chapter, shall establish a school site council in conformance with the requirements in Section 52012. The functions and responsibilities of such advisory committees and school site councils shall continue as prescribed by the appropriate law or regulation in effect as of January 1, 1979."

The 1983 Act, along with sunsetting various programs, also provided for onsite reviews of listed categorical programs, including bilingual education. (Stats. 1983, ch. 1270, § 15, pp. 5045–5047.) It created section 64001, subdivision (b) of which provides: "Onsite school and district compliance reviews of categorical programs shall continue, and school plans shall be required and reviewed as part of these onsite visits and compliance reviews." (*Ibid.*) Section 64001, former subdivision (c), governed the onsite reviews that were mandated in subdivision (b), making the local district, not the Superintendent, responsible for the review: "School districts shall ensure that for each school in a district operating categorical programs subject to this part, school plans and onsite program reviews are conducted at least once every three years by independent persons not employed by the school district. The Superintendent of Public Instruction shall adopt regulations establishing criteria for these reviews and shall develop a process for State Department of Education training and validation concerning these reviews. [¶] The Superintendent of Public Instruction may authorize a school district, on a school-by-school or districtwide basis, to conduct these reviews at least once every four, five, or six years, instead of at least once every three years, if he or she specifically determines that the school district has a history of operating high quality categorical programs subject to this part, in the particular school or in the district as a whole." (§ 64001, former subd. (c).)

Section 64001 was amended in 2001, removing the requirement that districts arrange for their own onsite reviews and the mandate that reviews occur every three years unless the Superintendent authorized otherwise. (Stats. 2001, ch. 724, § 3, pp. 5641–5644.) Instead, the Legislature gave the Superintendent the authority to establish the monitoring process and frequency. (*Ibid.*) Section 64001, subdivision (b), now reads: "Onsite school and district compliance reviews of categorical programs shall continue, and school plans shall be required and reviewed as part of these onsite visits and compliance reviews. The Superintendent shall establish the process and frequency for conducting reviews of district achievement and compliance with state and federal categorical program requirements. In addition, the Superintendent of Public Instruction shall establish the content of these instruments, including any criteria for differentiating these reviews based on the achievement of pupils, as demonstrated by the Academic Performance

Index developed pursuant to Section 52052, and evidence of district compliance with state and federal law. The state board shall review the content of these instruments for consistency with state board policy."

D. *Section 52177 Was Sunset as Part of the Sunset of Bilingual Education*

The trial court concluded that section 52177, subdivision (d), was not sunset by section 62000.2, but ruled that it was superseded by section 64001, finding that to be a more specific statute. Plaintiffs argue that the court ruled correctly on the sunset issue, while defendants renew their argument that section 52177 was subject to the sunset provision.[6] We are presented with a question of statutory interpretation: Did the Legislature intend for the sunset of bilingual education to affect section 52177, subdivision (d), which provides for the onsite review of programs for LEP students? This question is one of first impression. We have found no California case construing the scope of section 62000.2's sunset of the bilingual education program.[7] In addition, no legal commentary or other secondary authority pertinent to the question has been found.[8]

█ When interpreting statutory language, "[w]e begin with the fundamental rule that our primary task is to determine the lawmakers' intent." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934] (*Delaney*).) Courts have established a process of statutory

---

[6] Defendants assert that plaintiffs are barred by issue preclusion from asserting that the Superintendent has a ministerial duty to conduct onsite monitoring of LEP programs at least once every three years. They claim that plaintiffs here are bound by a 1996 consent decree entered by a trial court in a case, with different plaintiffs, that was initiated in 1979. That consent decree, which terminated in 2002 allowed the CDE to change onsite reviews from a three-to a four-year cycle.

The parties briefed the merits of defendants' affirmative defense of issue preclusion before the trial court. However, the trial court issued no ruling on the matter. We also decline to examine this affirmative defense, because defendants prevail on the merits.

[7] In *McLaughlin*, this court observed: "The [BBEA] remained in effect until its sunset by subsequent law on June 30, 1987." (*McLaughlin, supra,* 75 Cal.App.4th at p. 204.) This observation was not discussed and was dictum. In addition, an unpublished case affirmed a trial court order that included a finding that section 52177 had sunset. However, the review examined whether the trial court had abused its discretion in terminating a consent decree and was not a de novo review of the trial court's legal determinations. Other cases only mention that the program of bilingual education had sunset, without examining the scope of the sunset provision.

[8] Law review articles that do more than simply recognize the sunset of California's bilingual education program seem to assume, without discussion, that the sunset applied to the BBEA in its entirety. (See, e.g., Gale, *Bilingual Education: Should the Traditional Approach Be Abandoned in Favor of "English Immersion"?* (1998) 19 J. Juv. L. 158, 162 ["The Chacon-Moscone Act sunsetted on June 30, 1987."]; Wenkart, *The Battle over Bilingual Education in California* (1998) 123 Ed. Law Rep. 459, 466 ["The [BBEA] 'sunsetted' . . . on June 30, 1987."].)

interpretation to determine legislative intent that may involve up to three steps. (*MacIsaac v. Waste Management Collection and Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082 [36 Cal.Rptr.3d 650] (*MacIsaac*).) "As other courts have noted, the key to statutory interpretation is applying the rules of statutory construction in their proper sequence. [Citations.] We have explained this three-step sequence as follows: 'we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.' " (*Ibid.*, quoting *Riverview Fire Protection Dist. v. Workers' Comp. Appeals Bd.* (1994) 23 Cal.App.4th 1120, 1126 [28 Cal.Rptr.2d 601].)

■ The first step in the interpretive process looks to the words of the statute themselves. (*Delaney, supra*, 50 Cal.3d at p. 798; accord, *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 60 [53 Cal.Rptr.2d 741] ["primary determinant" of legislative intent is words used by the Legislature].) "The Legislature's chosen language is the most reliable indicator of its intent because ' "it is the language of the statute itself that has successfully braved the legislative gauntlet." ' " (*MacIsaac, supra*, 134 Cal.App.4th at p. 1082.) Unless the statute specifically defines the words to give them a special meaning, we give the words of the statute "a plain and commonsense meaning." (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 577 [110 Cal.Rptr.2d 809, 28 P.3d 860] (*Flannery*).) "Ordinarily, if the statutory language is clear and unambiguous, there is no need for judicial construction. [Citation.] Nonetheless, a court may determine whether the literal meaning of a statute comports with its purpose. [Citation.] We need not follow the plain meaning of a statute when to do so would 'frustrate[] the manifest purposes of the legislation as a whole or [lead] to absurd results.' " (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340 [33 Cal.Rptr.2d 109, 878 P.2d 1321].) "Thus, although the words used by the Legislature are the most useful guide to its intent, we do not view the language of the statute in isolation. [Citation.] Rather, we construe the words of the statute in context, keeping in mind the statutory purpose. [Citation.]" (*MacIsaac, supra*, 134 Cal.App.4th at p. 1083.)

If the interpretive question is not resolved in the first step, we proceed to the second step of the inquiry. (*Katz v. Los Gatos-Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 55 [11 Cal.Rptr.3d 546].) In this step, courts may "turn to secondary rules of interpretation, such as maxims of construction, 'which serve as aids in the sense that they express familiar insights about conventional language usage.' " (*Ibid.*) We may also look to the legislative history. (*Flannery, supra*, 26 Cal.4th at p. 579.) "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

■ "If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process. [Citation.] In this phase of the process, we apply 'reason, practicality, and common sense to the language at hand.' [Citation.] Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation. [Citation.] Thus, '[i]n determining what the Legislature intended we are bound to consider not only the words used, but also other matters, "such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction." [Citation.]' [Citation.] These 'other matters' can serve as important guides, because our search for the statute's meaning is not merely an abstract exercise in semantics. To the contrary, courts seek to ascertain the intent of the Legislature for a reason—'to *effectuate the purpose* of the law.' [Citations.]" (*MacIsaac, supra*, 134 Cal.App.4th at p. 1084.)

The first step in the interpretive process involves consideration of the plain language of the statute, read in the light provided by statutory purpose. Section 62000.2 sunsets the "program" of bilingual education. Neither party posits a special meaning to the word "program," so we look to its plain and commonsense meaning, which, as used here, is "a planned, coordinated group of activities, procedures, etc., often for a specific purpose." (Webster's Encyclopedic Unabridged Dict. of the English Language (1996) p. 1546, col. 1.) As we observed in *McLaughlin*, "The [BBEA] set forth a comprehensive legislative structure designed to provide funding and to train bilingual teachers sufficient to meet the growing student population of LEP students [citation] through bilingual instruction in public schools [citation]." (*McLaughlin, supra*, 75 Cal.App.4th at pp. 203–204.) Such a comprehensive, legislative structure easily satisfies the definition of "program." Because the BBEA[9] established a program of bilingual education, the wording of the statute naturally implies that it is the BBEA that was to be sunset.

■ Plaintiffs argue that section 62000.2 "does NOT refer to the [BBEA], which includes various provisions that address legally mandated services for LEP children. That section refers to and applies to only those provisions related to bilingual education. Most of the provisions made inoperative as a result of the sunset primarily imposed specific bilingual—not LEP—program requirements on districts." This argument fails to recognize that the stated purpose of the BBEA was "to require California school districts to offer bilingual learning opportunities to each pupil of limited English proficiency enrolled in the public schools, and to provide adequate supplemental financial

---

[9] Unless otherwise indicated, references to the BBEA include the amendments later made by the BEIRA.

support to achieve such purpose."[10] (§ 52161.) We must interpret all provisions of the BBEA as related to the purpose of offering "bilingual learning opportunities." Accordingly, section 52177, subdivision (d), even though it requires monitoring of "districts in which pupils of limited-English proficiency are enrolled" and not of bilingual education programs specifically, must be read as furthering the purpose of bilingual education and, hence, as part of the bilingual education "program."

Further, section 52177, subdivision (d), requires review "through an onsite technical assistance, monitoring, and enforcement process at least once every three years." Because "technical assistance," "monitoring," and "enforcement" must be read in accord with the stated purpose of the BBEA, the review requirement in this section must be for technical assistance in the provision of bilingual education, monitoring for adherence to the requirements of the BBEA, and enforcement of those requirements. This consideration directly ties the section 52177, subdivision (d), onsite review requirement to the provision of bilingual education, making it part of the bilingual education "program."

Plaintiffs also argue that "[t]he clear intent of the sunset statute was to relieve districts, not the state, of specific statutory obligations regarding the use of categorical funds disbursed to them." This argument is belied by the stated purpose of the 1983 Act that originally introduced the sunset of bilingual education, a purpose that included "providing greater flexibility at the state and local levels." (Stats. 1983, ch. 1270, § 1, p. 5037.) An interpretation under which the sunset of the program of bilingual education includes the mandate for onsite monitoring every three years is in accord with this purpose because it provides greater flexibility at the state level.

Finally, plaintiffs contend that section 62002 "made clear that the sunset was limited to requirements imposed on districts and schools as a condition of the <u>funding</u> provided for those programs." In support of this proposition, plaintiffs partially quote section 62002, adding boldface, as follows: "[A]llocation formulas . . . shall cease to be operative pursuant to this part both with regard to **state-to-district** and **district-to-school** disbursements. The **funds** shall be used for the intended purposes of the program, but all relevant statutes and regulations adopted thereto regarding the **use of the funds** shall not be operative, except as specified in Section 62002.5." Plaintiffs here omit the first sentence of section 62002: "If the Legislature does not enact legislation to continue a program listed in this part, the funding of that program shall continue for the general purposes of that program as specified in the provisions relating to the establishment and operation of the program."

---

[10] This is the purpose as it currently reads. It does not substantively differ from the original purpose statement, quoted above.

This opening sentence makes clear that the funding discussed in that section is the funding for the sunsetted program. Section 52177 imposed various duties on the Superintendent related to the administration of the BBEA, to be performed "[o]ut of funds appropriated for these purposes." Any such funds appropriated by the Legislature would have to be regarded as part of the funding of the program established by the BBEA, and thus are covered by section 62002.

We conclude that section 52177, subdivision (d), is part of the bilingual education "program" that was sunset in section 62000.2. Although we could end the analysis here, we continue to the second step of statutory interpretation because it lends weight to our conclusion that section 52177, subdivision (d), was sunset by section 62000.2.

In the second step of the interpretive analysis, we consider secondary rules of interpretation and legislative history. In this case, the legislative history is most instructive. The 1983 Act that established the sunset of the bilingual education program at the same time introduced former section 64001 which, as explained above, initially required that school districts and not the Superintendent would be responsible for the onsite reviews of categorical programs and specified that the reviews were to be performed by "by independent persons not employed by the school district." (Stats. 1983, ch. 1270, § 15, pp. 5045–5047.) The statute also gave the Superintendent the discretion to allow complying districts to perform such reviews at four-to six-year intervals rather than at three-year intervals. (*Ibid.*) This scheme of onsite reviews, which applied to bilingual education along with other categorical programs, was wholly inconsistent with section 52177's mandate that the Superintendent was to perform onsite reviews of LEP programs every three years.

■ "Every statute should be construed and applied 'with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' [Citations.] In doing so, we should seek to avoid absurd or anomalous results. [Citation.]" (*Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 531 [20 Cal.Rptr.2d 182].) In this case, we avoid the anomalous result of facially conflicting statutes with the conclusion that the Legislature intended to include section 52177 as part of the sunset of the bilingual education program. With that understanding of the Legislature's intent, the 1983 Act makes sense as a whole. The Legislature understood that by sunsetting bilingual education, it was removing a legislative mandate for onsite review of LEP programs, but, wishing such reviews to continue, created a different system for onsite reviews that would apply to LEP's as well as other categorical programs.

That section 52177 was sunset by section 62000.2 is also supported by consideration of another statute that is part of the BBEA. Section 52176 mandates that schools establish LEP parent advisory committees. Under plaintiffs' theory, this section would not have been sunset by section 62000.2 because, like section 52177, subdivision (d), it applies to LEP programs and not only to bilingual education.

Section 62002.5 governs exceptions to the sunset of programs and specifies: "Parent advisory committees and school site councils which are in existence pursuant to statutes or regulations as of January 1, 1979, shall continue subsequent to the termination of funding for the programs sunsetted by this chapter. Any school receiving funds from Economic Impact Aid or Bilingual Education Aid subsequent to the sunsetting of these programs as provided in this chapter, shall establish a school site council in conformance with the requirements in Section 52012. The functions and responsibilities of such advisory committees and school site councils shall continue as prescribed by the appropriate law or regulation in effect as of January 1, 1979." This provision implies that the Legislature, contrary to plaintiffs' theory, recognized that the mandate that schools establish LEP parent advisory committees would be sunset and that it was necessary to provide for an exception.

█ The inclusion of an exception for parent advisory committees for schools receiving funds for bilingual education in section 62002.5 would have been unnecessary if the Legislature had not recognized that the sunset of bilingual education would include section 52176. Because section 52176 and section 52177, subdivision (d), are alike in applying to LEP programs and not to bilingual education specifically, we conclude that the Legislature intended that section 52177 be sunset—unless an exception covering it were included in section 62005. Instead of creating such an exception, the Legislature allowed section 52177 to sunset and created a new statute to cover onsite monitoring in section 64001.

Analysis of the legislative history and the statutory scheme as a whole supports our conclusion in step one of the interpretive process that section 52177 was sunset by section 62000.2.

One other consideration also supports our conclusion that section 52177, subdivision (d), was sunset by section 62000.2. In the 1993–1994 session, the Legislature passed Senate Bill No. 33,[11] which was later vetoed by the

---

[11] Senate Bill No. 33 (1993–1994 Reg. Sess.) is available at <http://www.leginfo.ca.gov/pub/93-94/bill/sen/sb_0001-0050/sb_33_bill_940829_enrolled> (as of Jan. 9, 2013).

Governor.[12] Senate Bill No. 33 would have repealed the sunset of bilingual education, repealed the BBEA in its entirety, and established a new system of bilingual education. (Sen. Bill No. 33 (1993–1994 Reg. Sess.).) Section 1 of the bill recognized that the BBEA was currently inoperative: "Existing law, which is presently inoperative, establishes the Bilingual-Bicultural Education Act of 1976 . . . ." (Sen. Bill No. 33 (1993–1994 Reg. Sess.) § 1.) Even though this bill did not become law, both houses of the Legislature passed the bill and it demonstrates an understanding by the Legislature that the BBEA had become inoperative. An expression of the Legislature concerning its later understanding of the effect of prior legislation must be given consideration, unless there are more contemporaneous expressions by the Legislature indicating otherwise.

We conclude that the sunset of bilingual education rendered section 52177 inoperative. We reach such a conclusion by the plain language of the statutes, taking into account the stated purposes of the statutes. This conclusion is supported by the legislative history and a later expression of the Legislature's understanding of the effect of the sunset.

E. *Section 52177 Was Not Made Operative by Later Amendment*

In 1994, the Legislature passed Assembly Bill No. 2587 (1993–1994 Reg. Sess.), which included an amendment to section 52177. (Stats. 1994, ch. 922, § 127, pp. 5248–5249; compare with Stats. 1980, ch. 1339, § 33, pp. 4711–4712.) The substantive effects of the amendment were to remove what had been subdivisions (a)(5) and (b), which had mandated that the CDE develop certain plans by dates that had, at the time of the amendment, long passed. (Stats. 1994, ch. 922, § 127, pp. 5248–5249.) In addition, the remaining subdivisions of section 52177 were renumbered. (Stats. 1994, ch. 922, § 127, pp. 5248–5249.) The only changes to what is now subdivision (d) were nonsubstantive, replacing "limited English" with "limited-English" and removing the word "that," introducing subordinate clauses, in two locations. (Stats. 1994, ch. 922, § 127, pp. 5248–5249.)

In 2001 the Legislature passed Assembly Bill No. 1107 (2001–2002 Reg. Sess.), again amending section 52177. (Stats. 2001, ch. 750, § 14, pp. 6261–6262.) This amendment removed subdivision (e), which had called for the CDE to prepare an annual evaluation of bilingual needs and programs for submission to the Legislature and the governor. (Stats. 2001, ch. 750, § 14, pp. 6261–6262.) The amendment made no changes to subdivision (d). (Stats. 2001, ch. 750, § 14, pp. 6261–6262.)

---

[12] The Governor's veto message is available at <http://www.leginfo.ca.gov/pub/93-94/bill/sen/sb_0001-0050/sb_33_vt_940930> (as of Jan. 9, 2013).

Plaintiffs argue that even if section 52177 had been sunset by section 62000.2, it had been amended twice after the sunset date and these amendments effected a reenactment of the statute, rendering it currently operative. For this argument, plaintiffs rely on the principle that " '[t]he amendment of a statute ordinarily has the legal effect of reenacting (thus enacting) the statute as amended, including its unamended portions.' " (*People v. Chenze* (2002) 97 Cal.App.4th 521, 527–528 [118 Cal.Rptr.2d 362] (*Chenze*).)

In *Chenze*, the question before the court involved two statutes that provided different penalties for the same crime. (*Chenze, supra*, 97 Cal.App.4th at p. 525). The first statute provided that any battery on a custodial officer was a felony. (*Ibid.*) The second statute was amended, after passage of the first, to make battery against a custodial officer a misdemeanor, but if injury was inflicted, then it could be punished as either a misdemeanor or a felony. (*Ibid.*) The defendant argued that the first statute was impliedly repealed by the subsequent amendment to the second statute. (*Ibid.*) The court rejected this argument, holding that there was not an implied repeal because the two statutes were not in irreconcilable conflict (*id.* at p. 526) and that "the Legislature intended to give prosecutors a full panoply of prosecutorial options for a battery on a custodial officer." (*Id.* at p. 527.)

The court then went on to note that the Legislature had recently amended the first statute, which the defendant had argued was impliedly repealed. (*Chenze, supra*, 97 Cal.App.4th at p. 527.) The amendment was nonsubstantive, changing the word "his" to "his or her." (*Ibid.*) The court noted: "Although this was a minor amendment, it is not without significance because '[w]e do not presume that the Legislature performs idle acts . . . .' [Citation.] 'The amendment of a statute ordinarily has the legal effect of reenacting (thus enacting) the statute as amended, including its unamended portions.' " (*Ibid.*) The court was apparently trying to make the point that reenactment, through amendment, of the statute in question was a further indication that the Legislature intended both statutes to remain in the Penal Code and supported the conclusion that there had been no implied repeal of the statute.

In *Chenze*, the defendant argued that the statute in question had been impliedly repealed, which required the court to determine if there was an irreconcilable conflict between it and another statute. Here, no such question arises, because we have determined that the sunset of bilingual education rendered section 52177 inoperative. Even if we were to agree with plaintiffs that the postsunset amendments to section 52177 effected a reenactment of that section, this would not resolve the question of whether such a reenactment defeats the sunset provision, rendering section 52177 again operative.

Countering *Chenze*, defendants rely on *Estate of Cottle* (1983) 148 Cal.App.3d 1023 [196 Cal.Rptr. 440] (*Cottle*). *Cottle* involved a statute that

was added to the Revenue and Taxation Code by the Statutes of 1970, chapter 1453, section 1, page 2844. (*Cottle*, at pp. 1025–1026.) Statutes of 1970, chapter 1453, section 3, page 2844, remained uncodified and specified that the provision would not be operative for the estates of persons dying after December 14, 1974. (*Cottle*, at p. 1026, fn. 1.) In 1973, the codified provision was nonsubstantively amended by the Statutes of 1973, chapter 78, section 9, p. 135. (*Cottle*, at p. 1026.) The 1973 act did not repeat the section of the 1970 statute that specified the sunset date and the plaintiff argued that this meant the sunset date had been repealed. (*Cottle*, at p. 1026.)

The *Cottle* court rejected the plaintiff's argument. (*Cottle, supra*, 148 Cal.App.3d at p. 1026.) First, the court explained that because the codified provision and the uncodified sunset date were separate sections of the 1970 statute, amendment of the codified provision in 1973 did not affect the sunset date. (*Cottle*, at p. 1027.) "The unit the Legislature chose to amend was one section of a code, not the entire act contained in chapter 1453. Thus it did not repeal sections 2 and 3 of chapter 1453 in enacting chapter 78." (*Id.* at pp. 1027–1028.) Second, the court determined that "an examination of legislative intent discloses that chapter 78 was not intended to repeal the expiration date set forth in chapter 1453." (*Id.* at p. 1028.)

Because it deals with a sunset date that was unaffected by the statute that amended a provision subject to the sunset, *Cottle* comes closer to being relevant to the case at hand than does *Chenze*. However, there are two differences between *Cottle* and the situation here. First, the amendment to the statute in *Cottle* took place before the sunset date, whereas here we have an amendment made after the sunset date—an amendment to a section already rendered inoperative by the sunset. Second, the sunset date in *Cottle* was part of the same statute, albeit uncodified, as the provision subject to the sunset, while here the sunset of section 52177, as part of the BBEA, was enacted in a different statute and is located in a different part of the Education Code.

The question before us is whether the Legislature intended by its amendments to section 52177 to exempt that section from the sunset provision that had taken effect in 1987. Neither *Chenze* nor *Cottle* provides specific guidance about whether the reenactment of a code section through amendment after a sunset provision has rendered the code section inoperative, without changing the sunset provision, acts to defeat the sunset and render the law again operative. Nor have we found any other case that provides such guidance.

Plaintiffs find what they believe to be evidence that the Legislature intended to exclude section 52177 from the sunset of bilingual education in legislative history. In the 1993–1994 session, the Legislature passed two bills

that would have impacted section 52177: Assembly Bill No. 2587 (1993–1994 Reg. Sess.), which is the amendment currently under discussion, and Senate Bill No. 33 (1993–1994 Reg. Sess.), which, as we briefly discussed above, would have repealed the BBEA, including section 52177, and the sunset of bilingual education, and would have established a new program of bilingual education. The Legislative Counsel's office noted that the two bills conflicted in their impact on section 52177 and concluded that, by operation of specific language in Assembly Bill No. 2587, the conflict would be resolved by repeal of section 52177 if both bills were signed into law. Senate Bill No. 33 was vetoed and did not take effect. Plaintiffs find this set of facts "particularly revelatory of the Legislature's intent," but this is perplexing because nothing here reveals intent by the Legislature to exempt section 52177 from the sunset provision.

The Education Code is clear that the sunset of the programs specified in section 62000.2 is effective as long as "the Legislature does not enact legislation to continue a program listed in this part . . . ." (§ 62002.) Section 62002 also explicitly specifies that only those exceptions to the sunset that are listed in section 62002.5 remain operative. When the Legislature enacted its postsunset amendments to section 52177, it neither enacted legislation to continue bilingual education nor included that section as an exception to the sunset. This is a forceful indication that the Legislature did not intend its amendments to make section 52177 operative despite the sunset.

Finally, plaintiffs contend that a conclusion that section 52177 remained sunset despite the postsunset amendments would mean that these amendments were "idle acts" and the courts disfavor such interpretations. (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 22 [276 Cal.Rptr. 303, 801 P.2d 1054] ["[w]e do not presume that the Legislature performs idle acts, nor do we construe statutory provisions so as to render them superfluous"].)

It is not at all clear to us it would be superfluous or an idle act to enact nonsubstantive amendments to maintain the language of a statute that, though inoperative, remains part of the code. In any case, because we have found a strong indication of legislative intent that the postsunset amendments *not* defeat the sunset of bilingual education, we are not making a presumption that the Legislature performed an idle act.

We conclude that the postsunset amendments to section 52177 did not defeat the sunset of bilingual education to make that section currently operative. The intent of the legislation was to remove requirements for which

the specified date of completion had passed, to revise subdivision designators following that removal, and to make other nonsubstantive changes in wording. There is no indication that the Legislature intended to exempt section 52177 from the sunset of bilingual education, and a forceful indication that it did not. Though amended, section 52177 remained part of the body of code that was rendered inoperative in 1987.

F. *The Onsite Monitoring Obligation of Section 64001*

1. *The Suspension of CPM Monitoring*

Plaintiffs first contend that the Superintendent's suspension of onsite CPM monitoring was a violation of the mandate of section 64001 that "[o]nsite school and district compliance reviews of categorical programs shall continue . . . ." Even though section 64001 grants the Superintendent the discretion to "establish the process and frequency for conducting reviews," plaintiffs contend that such discretion "does not mean that [the duty] can be suspended altogether."

Because it is uncontested that onsite reviews resumed in January 2010, this issue is moot, so far as plaintiffs' request for a writ of mandate is concerned. However, plaintiffs' cause of action for taxpayer relief depends upon the allegation that "[b]y suspending monitoring activities . . . [defendants] have unlawfully diverted money intended for monitoring and oversight to other uses in violation of state and federal law." Thus, we must address plaintiffs' contention.

Although section 64001 contains mandatory language imposing upon the Superintendent the obligation to continue a program of onsite review, it also provides the Superintendent the discretion to establish the process and frequency of those reviews. Because the exercise of the duty to continue onsite reviews involves the exercise of significant discretion to perform the duty, the duty is discretionary and not ministerial. (*Sonoma AG Art v. Department of Food & Agriculture, supra*, 125 Cal.App.4th at p. 127.) Thus, the question is whether the Superintendent abused his discretion by suspending onsite CPM reviews for one year.

Plaintiffs cite *Kentfield v. The Reclamation Board* (1934) 137 Cal.App. 675, 681 [31 P.2d 431] for the proposition that the exercise of a duty may not be "indefinitely postpone[d]." Here, however, we have not an indefinite postponement of onsite reviews, but a time-limited suspension. Plaintiffs also cite

*California Hospital Assn. v. Maxwell-Jolly* (2010) 188 Cal.App.4th 559, 579 [115 Cal.Rptr.3d 572], for their proposition that, when dealing with the provision of services and programs fundamental to the health and welfare of the public, an agency's discretion is limited even in the face of fiscal challenges. We find no such general proposition in the cited case, which involved a state law freezing Medi-Cal reimbursement rates for budgetary reasons, the implementation of which the court found to be a violation of federal law. (*California Hospital Assn.*, at p. 579.)

The Superintendent's state of education address in 2009 makes clear that the suspension of onsite CPM reviews was prompted by "staggering" state budget cuts to schools, with more cuts expected in the future. Recognizing that onsite reviews taxed the resources of school districts in a time of fiscal crisis, the suspension of those reviews was meant to enable "districts and schools to focus every ounce of energy they have on improving student achievement, not on preparing for program audits." The suspension would also enable staff at the state level "to conduct a top-to-bottom review of our compliance monitoring system" so that "a redesigned system . . . will focus the greatest attention on those schools that need the most assistance." Nothing in these circumstances or objectives smacks of arbitrariness or capriciousness.

The Superintendent, in his notice of suspension of onsite monitoring, noted the CDE's other monitoring activities and assured the districts that these activities would continue during the suspension of onsite reviews. Defendants presented substantial evidence, outlined above, that these activities can detect serious noncompliance by districts. Indeed, the Superintendent left open the possibility that onsite visits might occur, despite the suspension, if such noncompliance were detected: "It is possible through these continuing monitoring efforts, that an onsite visit (on a case-by-case basis), using the CPM process, may be necessary to ensure compliance with statutory requirements." The facts that the Superintendent suspended only onsite monitoring and not all monitoring, and that the Superintendent left open the possibility of onsite visits if serious noncompliance were detected, support a conclusion that the suspension of onsite monitoring was neither arbitrary nor capricious.

Finally, the Superintendent's intention that the suspension would enable CDE staff to review the monitoring system so that a redesigned system could focus attention where it was most needed, demonstrates that the suspension was meant to actually help better effectuate the purpose of section 64001.

Nothing in the circumstances, intentions, or implementation of the suspension of onsite CPM reviews suggests that the Superintendent exercised his discretion to establish the frequency of such reviews in an arbitrary and capricious manner. Given the fiscal challenges faced by the CDE and

districts, both immediate and future, the suspension allowed the state to focus resources on a redesign of the monitoring system that could actually better effectuate the purpose of section 64001. Whether defendants actually accomplished this goal is the subject of other contentions by plaintiffs, discussed below, but we conclude that the suspension itself was not an abuse of discretion by the Superintendent.

## 2. Selection Criteria for Onsite Monitoring Visits

Section 64001, subdivision (b), provides, in relevant part: "In addition, the Superintendent of Public Instruction shall establish the content of [onsite review] instruments, including any criteria for differentiating these reviews based on the achievement of pupils, as demonstrated by the Academic Performance Index developed pursuant to Section 52052, and evidence of district compliance with state and federal law." When it established this requirement, the Legislature expressed its intent as follows: "It is the intent of the Legislature to enact legislation that requires the State Department of Education to base coordinated compliance reviews and other compliance functions on local educational agencies' histories of compliance with state and federal law and regulations, the number of verified complaints, and valid evidence of current academic achievement." (Stats. 2001, ch. 724, § 1, subd. (a)(4)(c), pp. 5639, 5640.)

Plaintiffs contend that, for the 2010 reviews, defendants eliminated noncompliance and compliance history as selection criteria, thereby violating section 64001. Defendants argue that the 2010 criteria included consideration of program improvement (PI) status under the NCLB as evidence of compliance. Plaintiffs counter that because PI status is itself based on raw achievement data, it cannot demonstrate compliance or noncompliance with program requirements that are not necessarily demonstrated by achievement scores.

 Section 64001 does not incorporate the specific factors mentioned in the statement of legislative intent quoted above. By using the words "including any criteria," the statute clearly and unambiguously requires only that the Superintendent use any criteria based on the academic performance index (index) and any criteria that are indicative of compliance. Because there is no ambiguity in the statute, we need not look to the statement of legislative intent to interpret it. (*People v. Overstreet* (1986) 42 Cal.3d 891, 895 [231 Cal.Rptr. 213, 726 P.2d 1288] ["[w]hen statutory language is clear and unambiguous, there is no need for construction and courts should not indulge

in it"]; accord, *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 179 [96 Cal.Rptr.2d 518, 999 P.2d 706] ["[w]hen statutory language is clear, judicial construction is neither necessary nor proper"].) Here we simply have a statute that clearly and unambiguously provides the Superintendent greater discretion than the statement of legislative intent would indicate.

That the 2010 criteria included use of the index is uncontested, so the issue is whether the 2010 selection criteria included "any criteria" for differentiating reviews that provide evidence of district compliance with state and federal law. The 2010 criteria included various elevated levels of PI status under NCLB. The question, then, is one of fact—whether elevated PI status under NCLB is actually evidence of compliance. The trial court agreed with defendants that it is. We will disturb this factual finding only if unsupported by substantial evidence. (*Saathoff v. City of San Diego* (1995) 35 Cal.App.4th 697, 701 [41 Cal.Rptr.2d 352].)

The declaration of Hector Rico, director of the Categorical Compliance Division of the CDE, contains the following: "Education Code section 64001 also directs that criteria based on a LEA's compliance with state and federal categorical program requirements be used to determine which LEA's should receive an onsite CPM review. . . . The CDE also reviewed federal compliance/accountability data regarding a LEA's improvement status under Title I, Title II, and Title III [of the NCLB]. Again, these sources of data were used because the accountability systems for Title I, II, and III are key accountability systems in place to address noncompliance. Further, because the system provides for progressively higher levels of sanctions based on non-compliance, the data from the system identifies the most at risk LEA's. This is because a LEA in a lower level of [PI], while non-compliant, can, with the assistance provided in the lower level improvement programs, correct the deficiencies in its programs, while when an LEA progresses to the higher levels of [PI] status it is an indication of more severe and systematic problems that are not being addressed and, as a result, that LEA is most at risk."

Laura Wagner, administrator of the District Improvement Office (DIO) in the CDE, amplified on how districts enter PI status and the consequences they then face: "Initially, the CDE identifies and provides LEA which are in danger of being identified as LEA's in [PI] with information and access to technical assistance in order to help meet the federal requirements under the Elementary and Secondary Education Act (ESEA), authorized as [NCLB]. LEA's which are in danger of being identified as PI are encouraged to conduct a self-assessment to identify deficiencies in their educational operations, programs and services so that a reform plan is designed and implemented. Any LEA that fails to make Adequate Yearly Progress for two

consecutive years becomes subject to [PI]. The DIO works with other divisions in CDE to assure LEA's address state and federal educational program requirements governing English learner educational programs. Provisions of the NCLB require LEA's in PI Year 1 to address seven questions in an LEA plan or LEA plan Addendum. The DIO staff assists and monitors the LEA's, through written correspondence, electronic technical assistance and face-to-face meetings in revising and implementing their LEA plans/Plan Addenda. LEA Plans or LEA Plan Addenda are submitted to CDE, reviewed; recommendations for improvement are made to authors and they are urged to post their LEA Plan or Plan Addendum on a local Website, updating it annually as needed. Any LEA that remains in PI for three years is subject to corrective action. In such circumstances the DIO staff will recommend the [SBE] impose one of seven corrective actions. In addition, the State Board may assign technical assistance based upon the severity and pervasiveness of LEA's underachievement problems."

The Rico and Wagner declarations provide substantial evidence supporting the trial court's conclusion that PI status is a criterion indicating noncompliance with NCLB categorical program requirements. Because the trial court's conclusion of fact is supported by substantial evidence, we will not disturb it.

### 3. *Plaintiffs' Further Allegations of Abuse of Discretion*

Plaintiffs contend that defendants abused their discretion by suspending onsite CPM monitoring for one year, failing to "take the necessary steps to establish a cohesive and accountable process for identifying districts for review in 2010 or subsequently," acting "contrary to the purpose of the onsite monitoring statutes," ignoring "mandatory selection criteria," and acting "without any evidence or even suggestion that the prior onsite monitoring process—CPM—was ineffective or overly burdensome." We have dealt with some of these contentions above, and deal with the remainder here.

Plaintiffs first argue that "[b]y suspending onsite monitoring, discarding the CPM process, and failing to develop or implement an effective alternative, respondents have acted contrary to the purpose of the monitoring statutes and have therefore abused their discretion." Citing *Griffin v. Board of Supervisors* (1963) 60 Cal.2d 318, 322 [33 Cal.Rptr. 101, 384 P.2d 421], plaintiffs propose that discretionary language in a statute establishing an obligation will not shield an official or agency from a finding that they acted arbitrarily and capriciously if their acts, or failure to act, result in a situation that is at odds with statutory purpose. They then argue that there is no rational relationship

between defendants' actions and the purposes of sections 62001 and 64001, which they characterize as ensuring that districts provide services that compensate for educational disadvantages.

Key to plaintiffs' argument is that program compliance cannot be determined without onsite monitoring, because the record shows that compliance with many program elements can be determined only through an onsite review. Defendants counter this by pointing out that despite the suspension and changes in onsite monitoring, CDE's other monitoring activities continued. As we have noted above, these other monitoring activities have proved capable of detecting noncompliance by districts, triggering corrective action.

The facts cited by both plaintiffs and defendants are not in conflict. While fine details of compliance might be amenable to detection only by an onsite review, simultaneous noncompliance in a number of these details would logically lead to symptoms detectable at the higher level of oversight provided by the other monitoring activities.

Plaintiffs allege several specific ways in which the Superintendent supposedly abused his discretion via actions that did not fulfill the purpose of effective monitoring. First, they contend that the failure to conduct onsite reviews for 12 months thwarted the purpose of onsite monitoring, but we have already concluded that the one-year suspension was not an abuse of discretion.

Second, plaintiffs complain that the result of the redesign of onsite monitoring drastically reduced the number of districts actually reviewed and that the review and redesign process was deficient in its quality. They complain that, as of the hearing date, no plan was in place for the 2010–2011 reviews and no permanent selection criteria had been determined.

The reduction in the number of districts reviewed is consistent with the aim of the redesign, which was to ensure that onsite reviews were directed to the districts most in need of oversight and correction, an aim that is not at odds with the purposes of sections 64001 and 62001.

As for the redesign effort itself, plaintiffs argue: "Respondents failed to follow any recognizable steps of a review and redesign process, such as planning, taking input from key staff, establishing design standards, piloting and testing. Respondents established no standing task force or work group with the responsibility of developing an alternative system. No regular meetings or briefing of senior staff regarding the progress of the redesign took place. No timeline for completion and implementation of the redesigned process was ever established. [¶] The court states that the record 'undisputedly establishes that CDE administrators weighed and considered information, data and recommendations from staff concerning the elements, criteria

processes and procedures for a redesigned onsite monitoring scheme . . . [.]' [Citation.] However, the citations to the record refer to argument, propounded by the respondents, not evidence."

In quoting from the trial court's statement of decision, plaintiffs confuse the court's summation of defendants' arguments with a determination of fact by the court. However, it is clear from the statement of decision that the court found defendants' arguments more persuasive, and a factual finding in accord with the quoted passage is implicit in the court's decision. We will not disturb this factual finding unless it is unsupported by substantial evidence. (*Saathoff v. City of San Diego, supra*, 35 Cal.App.4th at p. 701.)

The record contains evidence in support of the following: Prior to the suspension of onsite monitoring, CDE administrators were solicited for strategies and proposals concerning a redesigned monitoring system. Review of the compliance monitoring system continued after the suspension and involved numerous CDE staff members. Primary responsibility for coordinating the redesign effort rested with Hector Rico, director of the Categorical Compliance Division. There were numerous meetings with CDE staff concerning the review of the CPM process. Deputy Superintendent Marsha Bedwell described an "ongoing dialogue, as people participate in CPM work, about what things they think work and things don't" and said that "the direction has been to try to reach out broadly to those who have interests in the CPM process as it is being redesigned, and certainly that's work that is ongoing and will continue and is not yet complete." Many staff recommendations were implemented. During the redesign, CDE piloted and evaluated the expanded use of the California automated information system (CAIS) to assess, track and monitor information regarding districts' educational programs and services. Bedwell explained that "[t]he prior practice, which involved selection of a limited number of districts for review onsite every four years . . . can be modified when we have [CAIS] that allows for continuous access to a range of data and documents online."

The sampling of evidence just cited constitutes substantial evidence supporting a factual finding that CDE administrators weighed and considered information, data and recommendations from staff concerning the elements, criteria, processes and procedures for a redesigned onsite monitoring scheme. No complex project is perfectly planned or executed, but the record does not support a conclusion that defendants so neglected or mismanaged the redesign process as to amount to an abuse of discretion.

Third, plaintiffs complain that the number of districts scheduled for review for the 2009–2010 cycle was unreasonable and did not fulfill the purpose of onsite monitoring. Plaintiffs argue that in prior cycles, large percentages of

districts that had received onsite reviews had been found to be noncompliant in one or more areas. However, plaintiffs' arguments again fail to acknowledge the range of CDE monitoring activities and the evidence does not demonstrate that serious noncompliance by a district would not have been detected by other means. The stated purpose of the redesign was to target resources on districts identified as being most in need of assistance in meeting compliance objectives. This objective was not an abuse of discretion and plaintiffs point to no evidence that shows that the criteria used did not actually identify those districts most in need of assistance.

Finally, plaintiffs allege that the temporary suspension was an abuse of discretion because there is no evidence that a review and redesign of the monitoring system required a suspension of monitoring, and no fiscal savings were identified to justify the suspension. However, plaintiffs cite no authority that would lead us to conclude that exercise of the Superintendent's discretion is contingent on a showing of necessity or fiscal savings.[13] Moreover, plaintiffs' arguments focus solely on fiscal savings at the state level and take no account of the Superintendent's stated purpose of allowing cash-strapped school districts to focus on student achievement rather than on preparing for program audits.

We are unable to conclude that the temporary suspension of onsite monitoring, the change in selection criteria, the redesign of the monitoring system, or the reduction in the number of districts subject to onsite monitoring in a given year resulted from decisions that were made arbitrarily or capriciously, that lacked evidentiary support, or that were unreasonable.

G. *Section 54005's Mandate to Issue Regulations*

Section 54005 provides: "The [SBE] shall adopt regulations setting forth the standards and criteria to be used in the administration, monitoring, evaluation, and dissemination of programs submitted for consideration." Plaintiffs contend that the SBE has failed to adopt regulations specifying the standards and criteria to be used in the monitoring of categorical programs.

---

[13] Plaintiffs do cite *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 217 [211 Cal.Rptr. 398, 695 P.2d 695] for the proposition that "financial considerations cannot justify an infringement of a basic constitutional right absent a showing that no less onerous cost-cutting methods are available." They also cite *Mooney v. Pickett* (1971) 4 Cal.3d 669, 680 [94 Cal.Rptr. 279, 483 P.2d 1231] for a similar proposition regarding a statutory violation. Here, however, we are concerned with the question of abuse of discretion, not the violation of a constitutional right or a statutory violation.

Defendants argue that California Code of Regulations, title 5, sections 3900 et seq. and 4400 et seq. fulfill the requirements of Education Code section 54005. The trial court agreed with defendants.

Plaintiffs' arguments seem to rely on a reading of section 54005 that requires the SBE to separately set forth standards and criteria for administration, monitoring, evaluation, and dissemination. However the section merely requires that the regulations establish standards and criteria and that these standards and criteria will then be used to perform various functions. The statute does not require separate standards and criteria for each function, or even require that the functions be mentioned specifically in the regulations. Plaintiffs' argument can prevail only if none of the standards and criteria set forth in the regulations can rationally be used for the monitoring of categorical programs.

California Code of Regulations, title 5, section 3900 specifies: "The provisions of this chapter apply to applications for funds under the following statutes and programs: [¶] . . . [¶] Educationally Disadvantaged Youth Programs . . . ." Because California Code of Regulations, title 5, section 3900 et seq. applies to applications for funds and not to the monitoring of programs after funds have been granted, we look to California Code of Regulations, title 5, section 4400 et seq. for regulations containing standards and criteria that can be used for the monitoring of categorical programs.

California Code of Regulations, title 5, section 4401 provides: "Except as otherwise provided in this chapter, SCE[14] funds must be expended in accordance with the requirements of Title I of the Elementary and Secondary Education Act as amended." This regulation establishes a criterion that the use of SCE funds be utilized in accordance with federal law, a criterion that may be used in the monitoring of funded programs.

California Code of Regulations, title 5, section 4402 provides, in part: "The compensatory education services for educationally disadvantaged students who are English learners shall expand and improve the services already otherwise provided to these students." This regulation establishes a standard that may be used in the monitoring of LEP programs.

California Code of Regulations, title 5, section 4411 provides, in part: "If the available compensatory education funds are not sufficient to serve all

---

[14] SCE is an abbreviation for "State Compensatory Education." (See Cal. Code Regs., tit. 5, § 4400.)

educationally disadvantaged students who meet the district criterion for participation at every eligible school, the district must select schools for participation in rank order, from highest to lowest, according to the relative degree of concentration of pupils in need as determined under Section 4410." This regulation establishes a criterion, conformance to which may be determined by the monitoring of programs.

California Code of Regulations, title 5, section 4415, subdivision (b) provides: "The total number of students receiving ESEA, Title I and SCE funds, as determined by district policy pursuant to this article, must not exceed the total number of students who score below the fiftieth percentile on a nationally normed achievement test unless the district is able to demonstrate that such a policy is appropriate." This regulation establishes a criterion, conformance to which may be determined by the monitoring of programs.

We need go no further. California Code of Regulations, title 5, section 4400 et seq. specify standards and criteria that can be used for the monitoring of categorical programs. We affirm the trial court's determination that defendants have not breached their duty under section 54005.

## II. *The Grant of Defendant's Motion for Summary Judgment*

Plaintiffs seek reversal of the trial court's grant of summary judgment as to the writ cause of action. They concede that "if this court affirms the lower court's judgment denying the petition for writ of mandate then the court's order granting summary judgment should also be affirmed." Because we have found no grounds for reversing the trial court's denial of plaintiffs' motion for peremptory writ of mandate, we affirm the trial court's order granting defendants' motion for summary judgment as to the writ cause of action.

Plaintiffs also seek reversal of the trial court's grant of summary judgment as to the taxpayer cause of action and declaratory relief. In this instance, as well, plaintiffs apparently concede that reversal would be contingent on our reversal of the trial court's denial of their motion for peremptory writ of mandate: "The underlying legal issues presented in the writ cause of action are identical to those presented in the Taxpayers Cause. Therefore, in the event that this court reverses the trial court, it should do so with respect to this cause of action as well." Thus, we also affirm the trial court's order granting defendants' motion for summary judgment as to plaintiffs' remaining causes of action.

## DISPOSITION

The orders of the trial court denying plaintiffs' motion for peremptory writ of mandate and granting defendants' motion for summary judgment are affirmed.

Kline, P. J., and Haerle, J., concurred.